THE WEST RIVER BRIDGE COMPANY, PLAINTIFFS IN ERROR, v. JOSEPH DIX AND THE TOWNS OF BRATTLEBORO' AND DUMMERSTON, IN THE COUNTY OF WINDHAM, DEFENDANTS IN ERROR.

THE WEST RIVER BRIDGE COMPANY, PLAINTIFFS IN ERROR, v. THE TOWNS OF BRATTLEBORO' AND DUMMERSTON, IN THE COUNTY OF WINDHAM, AND JOSEPH DIX, ASA BOYDEN, AND PHINEAS UNDERWOOD, DEFENDANTS IN ERROR.

A bridge, held by an incorporated company, under a charter from a State, may be condemned and taken as part of a public road, under the laws of that State.

This charter was a contract between the State and the company, but, like all private rights, it is subject to the right of eminent domain in the State.

The Constitution of the United States cannot be so construed as to take away this right from the States.

Nor does the exercise of the right of eminent domain interfere with the inviolability of contracts. All property is held by tenure from the State, and all contracts are made subject to the right of eminent domain. The contract is, therefore, not violated by the exercise of the right.

The Constitution of the United States intended to prohibit all such laws impairing the obligation of contracts as interpolate some new term or condition, foreign to the original agreement.

Property held by an incorporated company stands upon the same footing with that held by an individual, and a franchise cannot be distinguished from other property.

THESE cases were brought up, by a writ of error issued under the twenty-fifth section of the Judiciary Act, from the Supreme Court of Judicature of the State of Vermont.

In 1795, the legislature of Vermont passed an act, entitled, "An act granting to John W. Blake, Calvin Knowlton, and their associates, the privilege of building a toll-bridge over West River, in Brattleboro'."

The first section enacted that Blake, Knowlton, and their associates, should be and continue a body politic and corporate, by the name of the West River Bridge Company, for one hundred years; and that they should have the exclusive privilege of erecting and continuing a bridge over West River, within four miles from the place where said stream united with Connecticut River.

The second section fixed the rate of tolls.

The third section enacted, that, at the expiration of forty years from the 1st of December, 1796, the judges of the Supreme Court should appoint commissioners to examine the books and accounts of the company; and if it should appear that the net proceeds should have averaged a larger sum than twelve per cent. per annum, the judges should lessen the tolls, provided they did not reduce them so low as to prevent the proprietors from receiving twelve per cent.

The remaining sections provided for the government of the company, for their keeping the bridge in good repair, &c., &c.

During the years 1795, 1796, and 1797, the company built the bridge.

In 1799, Josiah Arms conveyed to the company a small piece of land, about two acres, lying on the south bank of West River.

In 1803, the legislature passed a supplement to the charter, which altered the rate of tolls, but left the remaining parts of it unaltered.

In November, 1839, the legislature passed an act entitled, "An act relating to highways," in and whereby it was enacted and provided, that "whenever there shall be occasion for any new highway in any town or towns in this State, the Supreme and County Courts shall have the same power to take any real estate, easement, or franchise of any turnpike, or other corporation, when, in their judgment, the public good requires a public highway, which such courts now have, by the laws of this State, to lay out highways over individual or private property; and the same power is granted, and the same rules shall be observed, in making compensation to all such corporations and persons, whose estate, easement, franchise, or rights shall be taken, as are now granted and provided in other cases; provided, that no such real estate, easement, or franchise shall be taken in the manner and for the purposes aforesaid, unless the whole of such real estate, easement, or franchise belonging to said corporation shall be taken, and compensation made therefor."

On the 25th of August, 1842, Joseph Dix and fifty-four other persons presented the following petition to the County Court for the county of Windham: —

"That the public highway or stage-road, leading from the stage-house of Henry Smith, in Brattleboro', through the northerly part of said town, and through the town of Dummerston, to the south line of Putney, in said county, has for a long time been a subject of great complaint, both on account of the steep and dangerous hills, and the great difficulty of keeping the same in repair, as now travelled. That various and repeated

attempts have been made to improve the same, with little success. Your petitioners further represent, that, from actual survey and admeasurement, they are confident a highway may be laid between said termini, and made at a moderate expense, which will avoid most of the hills and be perfectly satisfactory to the public. Your petitioners are aware that some alterations have recently been made on said route by a committee of this court, upon the petition of Paul Chase and others, and that indictments are now pending against said towns for not making the same; but your petitioners believe that said committee, in ordering said alterations, are influenced by the solicitations of interested individuals, rather than the public good, and that if said alterations are worked, they would form but little improvements, and that the public will never be satisfied until said highway is laid on the best possible route; and further, that it will cost as much to make said alterations, (which we consider to be useless,) as it will to make a good travelling road on the route contemplated by the petition.

" And your petitioners further represent, that the toll-bridge across West River, on said route in Brattleboro', owned by the West River Bridge Corporation, is, and for a long time has been, a sore grievance, both to the traveller and the inhabitants of the towns in the vicinity, who have occasion to pass and repass, travel and labor, on said highway; and however the legislature in the infancy of the State may have exercised a sound discretion in granting said toll-bridge, yet, in the present improved and thriving condition of the inhabitants, your petitioners are unable to discover any good reason why said grievance should longer be endured, or why the wealthy town of Brattleboro' should not, as well as other towns much less able, sustain a free bridge across West River. Your petitioners therefore pray the court, by an able, judicious, and disinterested committee, to cause said route to be surveyed, and such alterations and improvements to be made in the old road, or a new one to be laid, as the public good may require; and also to take the real estate, easement, or franchise of the 'West River Bridge Company,' a corporation owning the aforesaid toll-bridge, for the purpose of making a free road and bridge across said river, agreeable to the statute in such case made and provided; and as in duty bound will ever pray."

In conformity with the above prayer, the court appointed three persons to examine the premises and make report.

In May, 1843, the commissioners reported that they had examined the premises, and were unanimously of opinion that a new road ought to be laid out over a considerable portion of the distance between the termini mentioned in the petition,

which road, they said, they had caused to be surveyed and laid out. The report then proceeded as follows : —

"The said commissioners also examined the toll-bridge across West River in Brattleboro', and have taken into consideration the propriety of laying a free road across said bridge, at the expense of said town of Brattleboro', as contemplated by said petition ; and in this the said commissioners were unanimously of the opinion, that public good required that the real estate, easement, or franchise of the West River Bridge Corporation should be taken, and compensation made therefor, that said toll-bridge might thereafter become a free bridge. The said commissioners have therefore assessed to the said West River Bridge Corporation the sum of four thousand dollars, to be paid to the said West River Bridge Corporation out of the treasury of said town of Brattleboro', in full compensation for all real estate, easement, or franchise belonging to said corporation, which real estate, easement, or franchise is situate in said town of Brattleboro', near the mouth of West River, and is supposed to be more particularly described in a deed from Josiah Ames to the West River Bridge Company, dated on the first day of April, in the year seventeen hundred and ninety-nine, and recorded in Brattleboro' records of deeds, liber D, page 203, containing two acres of land, be the same more or less, with a covered bridge, gate, toll-house, barn, and other buildings thereon

                              THOMAS F. HAMMOND,
                              JULIUS CONVERSE,
                              ISAAC N. CUSHMAN,
                                        *Commissioners.*"

To this report, the West River Bridge Company, the town of Brattleboro', the town of Dummerston, and the persons who were entitled to damages for the loss of land, &c., all filed objections.

The town of Brattleboro' filed five objections, the last of which was as follows : —

"5. Because it does not appear from said report, and is not true in fact, that there was, or that said commissioners considered that there was, any occasion for any new highway on said route within a great distance, to wit, within two miles of said bridge."

The town of Dummerston filed ten objections, the first four of which are as follows : —

"1. Because said commissioners proceeded in said report to discontinue the Indited Road, so called ; a road of which the petition of Joseph Dix and others did not ask the discontinu-

The West River Bridge Company *v.* Dix et al.

ance; a road which said town was then liable to make, and has since raised money to make.

" 2. Because the acceptance of said report would render the maintenance of two roads necessary through a large part of the town, while the natural difficulties are so great, that, with only one, the burdens of said town, when compared with its means, are unusually onerous.

" 3. That said surveyed route, or Nurse Swamp route, so called, is a longer, more wet, and more expensive route, between the termini in question.

" 4. That said commissioners were partial, prejudiced, and mistaken; and acted under the influence of misrepresentations made by interested persons."

The persons to whom damages were awarded by the report were fifteen in number. Eleven of these filed six objections, the first of which was as follows: —

" 1. Because the said commissioners were partial, prejudiced, and mistaken, and acted under the misrepresentations made by interested persons."

The West River Bridge Company filed seven objections, the sixth of which stated the charter, their observance of it, and their desire for its continuance.

In November, 1843, the case was tried, and the report of the commissioners was accepted. The two towns were ordered to pay the damages awarded to the persons through whose lands the road was laid out, and " the town of Brattleboro' to pay to the West River Bridge Company the sum of damages, as assessed by said commissioners, by the 31st day of May, 1844; and that said bridge be opened for the free public travel by the 1st day of June, 1844."

In February, 1844, a writ of *certiorari* was sued out from the Supreme Court, whereby the whole proceedings of the County Court were brought up for review. Upon the argument, the West River Bridge Company, in addition to the exceptions which they had presented to the court below, filed the two following: —

" First. That the said statute of this State, having been enacted long after the said grant by the same State of the said franchise of toll to the said West River Bridge Corporation, and long after the said grant was accepted and acted on by the said corporation, is of no validity for the purpose of authorizing the taking of the said franchise against the consent of said corporation, or the laying out of a free public highway over and upon the said bridge, on the ground that the said statute, if it purports to authorize the proceedings aforesaid, is a violation of the contract of this State with the said corporation, and is

therein repugnant to that clause of the Constitution of the United States which provides that no State shall pass any law impairing the obligation of contract.

" Secondly. That inasmuch as it is apparent upon the said record, and proofs filed in said cause, copies of which are hereunto annexed, that there is no occasion for any new highway within the said town of Brattleboro', near said bridge; and that no new highway is in fact laid out, or adjudged to be laid out, within the distance of two miles from either terminus of said bridge; and that the damages awarded to the said West River Bridge Company are grossly inadequate as a compensation for the value of the corporate franchise, and other property adjudged to be taken; the taking of the said franchise, and laying out of the said free public highway over and upon the said bridge, by the judgment of the said County Court, under such circumstances, a mere evasion, under color of law, of the said provision of the Constitution of the United States, and an exercise of authority under this State which is wholly invalid as against the said West River Bridge Company, on the ground of its being repugnant to the constitutional provisions aforesaid."

The Supreme Court passed the following judgment: —

" And thereupon, after hearing the respective parties by their counsel, upon their respective allegations, and the said exceptions in said record contained, it is considered, ordered, and adjudged by the court here, that the statute aforesaid was and is valid for the purpose of taking the said franchise, and laying out the said free public highway over and upon the said bridge; and that the same was and is in no wise repugnant to the Constitution of the United States; and that the said proceedings of the said County Court were a lawful exercise of the authority of the State under the said statute, and neither repugnant to nor an evasion of the provisions of the said Constitution; and that there is no error in the record and proceedings aforesaid; and that the said defendant parties recover their costs."

To review this judgment, a writ of error brought the case up to this court.

It was argued by *Mr. Webster* and *Mr. Collamer*, on behalf of the plaintiffs in error, and *Mr. Phelps*, for the defendants in error. On both sides argumentative briefs were filed; and although all the counsel added many illustrations and arguments, orally, to their respective briefs, in the progress of discussion, yet the reporter thinks it the safer course to reprint the briefs themselves.

*Mr. Webster* and *Mr. Collamer*, for the plaintiffs in error.

In the township of Brattleboro', in Vermont, A. D. 1795, there was a public highway along the west bank of Connecticut River, and passing across West River, a tributary of the Connecticut, which public highway was re-surveyed that year, and ever has, and still does, continue unaltered within said town. This re-survey was under an act of 1795. (Whitney's affidavit, and copy of survey; Record, pp. 34, 35.)

In 1795, by an act of the legislature of Vermont, the plaintiffs were created a corporation for one hundred years, with the exclusive privilege of erecting and continuing a toll-bridge over West River, within four miles of the place where that stream unites with Connecticut River, and the rate of toll was fixed by said act. The act provided that the bridge should be built where the road was to be surveyed, and within two years, and it was so done. (Charter, Record, p. 26, § 4, and proviso to § 6, p. 28.)

The act further provided, that, at the expiration of forty years, the outlay and income of the plaintiffs might be examined by commissioners, appointed by the Supreme Court; and, if the plaintiffs had realized more than twelve per cent. per annum, the court might reduce the tolls so as to yield only that amount. The plaintiffs, within the limited time, erected the bridge, and have ever since sustained it, having several times rebuilt it; and now, at great expense, have erected so large a part of it with stone, that to sustain it is much less expense than formerly, and the franchise and bridge are now of great value, to wit, of the value of ten thousand dollars. (Record, p. 56.)

By the general law of Vermont relating to highways, the County Court, on petition, may appoint commissioners to lay out highways within the county, who survey the way and assess the damage to the landholders, and make report to the court, who thereupon make their orders accordingly; and the same power is given to the Supreme Court, in laying highways into two or more counties. (Revised Statutes of Vermont, p. 553.)

In November, 1839, the legislature passed "an act relating to highways," which provided, " whenever there shall be occasion for any new highway in any town or towns within this State, the Supreme and County Courts shall have the same power to take any real estate, easement, or franchise of any turnpike or other corporation, when in their judgment the public good requires a public highway, which such courts now have, by the laws of the State, to lay out highways over individual or private property; and the same power is granted, and

the same rules shall be observed, in making compensation to all such corporations and persons whose estate, easement, franchise, or right shall be taken, as are now granted and provided in other cases; provided that no such real estate, easement, or franchise shall be taken in the manner and for the purpose aforesaid, unless the whole of such real estate, easement, or franchise belonging to said corporation shall be taken, and compensation made therefor."

In 1842, a petition was presented to the County Court of the county of Windham, Vermont, praying for a re-survey and improvements in the highway, beginning in the village of Brattleboro', and leading north across this bridge, and thence north to and through the town of Dummerston; and in relation to this bridge, it is represented in the petition as a great "grievance, and should no longer be endured"; and praying that said road be re-surveyed, and the real estate, easement, or franchise of the "West River Bridge Company" should be taken for the purpose of making a free road and bridge across said river. On that petition the court appointed commissioners, who proceeded to examine the road and decide in the premises.

They surveyed and laid out a road in this manner, (as appears, Record, p. 17,) beginning at Brattleboro' village, about one mile south of this bridge, and following the existing highway to and across the bridge, and thence north of the bridge two miles, without making any alteration whatever. (Record, p. 32, and Report, p. 17.) They then report changes in the highway, all but fifty rods of which is in Dummerston; and, as to this bridge, the commissioners report as follows: —

"The said commissioners also examined the toll-bridge across West River, in Brattleboro', and have taken into consideration the propriety of laying a free road across said bridge, at the expense of the town of Brattleboro', as contemplated by said petition; and in this the said commissioners were unanimously of opinion, that the public good required that the real estate, easement, or franchise of the West River Bridge Company should be taken, and compensation made therefor, that said toll-bridge might be made a free bridge. The commissioners have therefore assessed to the said West River Bridge Corporation the sum of four thousand dollars, to be paid to the said West River Bridge Corporation out of the treasury of said town of Brattleboro', in full compensation for all real estate, easement, or franchise belonging to said corporation, which real estate, easement, or franchise is situate in said town of Brattleboro', near the mouth of West River." (Record, pp. 15, 16, and Ames's deed, p. 32.)

This report was returned into court, and though exceptions

and objections were thereto made on the part of the present plaintiffs, as well as by said town of Brattleboro', yet the court, on the hearing, decided to accept and approve said report, and established the whole of said road, and ordered that Brattleboro' pay the present plaintiff the said sum of four thousand dollars, and "that said bridge be opened for the free public travel." (Record, pp. 25, 26.)

This decision and these proceedings were carried before the Supreme Court of the State by *certiorari*, and by that court affirmed; whereupon the plaintiff brings this writ of error.

By the twenty-fifth section of the Judiciary Act of the United States, it is provided, "That a final judgment or decree in any suit, in the highest court of law or equity of a State in which a decision of the suit could be had, where is drawn in question the validity of a statute of, or authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of such their validity, may be re-examined and reversed or affirmed in the Supreme Court of the United States upon a writ of error." The plaintiff insists that this power and authority exercised under the State of Vermont, and the statute of that State, passed in 1839, under which the power was exercised in the manner it was done, are repugnant to the Constitution of the United States.

This court is never called on to decide a State law unconstitutional in the abstract. It must have a case before it, and the question is, Is it constitutional as construed and applied in the case by the State court? If it were not so, the State courts have but to take a State law, good on its face, and construe it to cover cases, however grossly unconstitutional, and there would be no redress, as it might be said, The law is good, but the decision is bad, but that is not within the jurisdiction of this court. The only way is to treat the State statute as the State court has treated and applied it in the case, and then to consider whether, for such a purpose, it is constitutional. Such has been the course in this court. A law may be constitutional for some purposes, and not for others. (Golden *v.* Prince, 3 Wash. C. C. R. 313.) The statute of Maryland, levying a tax on any bank put in operation in that State without consent of its legislature, was not decided as unconstitutional in the abstract. It was undoubtedly good as to private banks, or those of other States; but when it was applied by the State courts to a branch of the United States Bank, then this court decided that, for that purpose, it was bad, being unconstitutional. (McCulloch *v.* Maryland, 4 Wheaton, 235.) The statute of New York, granting the exclusive navigation of its

waters by steam-vessels, was, by this court, holden as unconstitutional, as applied to vessels coming from without the State. (Gibbons v. Ogden, 9 Wheaton, 209.) Indeed, the words of the United States statute are carefully adapted to such an object. It provides, not merely that this court is to pass on the constitutionality of the State law, but on any authority exercised under any State. If, then, it appears that, in this case, the plaintiffs' rights have been invaded by any authority under the State, or by any law of the State repugnant to the Constitution of the United States, the decision of the State court must be reversed.

I. It is insisted by the defendant, that this is a pretended exercise of the power of the eminent domain, as an incident of sovereignty, — the taking of private property for public use; when, in truth and reality, it is but an actual impairing and destroying the force and obligation of a contract, contrary to the provisions of the United States Constitution.

This is attempted to be effected under the disguise of calling this grant and franchise property. It is no such property as falls within, or can be the subject-matter of, the eminent domain. The original idea of the eminent domain was the right of sovereignty, or residuum of power over the land which remained in the sovereign or lord paramount after the fee granted to the feudatory, and was therefore confined to the realty. In the progress of arts and commerce, when personal property became worthy of legal consideration, this power of sovereignty was extended over that, and even included debts. But this grant to the plaintiffs can fall within no such category of property. It is a franchise, a pure franchise. It included the grant of no property, real or personal. It lay in grant, and not in livery. It was created by, and had its existence in, the grant in the contract; and it could cease only by impairing and destroying that contract. If a private debt or contract, as a chose in action, could be taken under the power of eminent domain, yet still the debt is kept on foot and in force. But this is an attempt, not to take and keep in force this contract, but actually to extinguish and destroy it. Even if it were true, as has been holden, that property which the corporation create or acquire, and the taking of which would not destroy the grant, might be taken in the proper exercise of this power of eminent domain, yet the grant itself, the franchise, is no property. A franchise is defined to be "a royal privilege or branch of the king's prerogative, subsisting in the hand of a subject."

The State alone possessed the power to erect and sustain toll-bridges across large streams in the public highway. This prerogative was duly granted to the plaintiffs as to a certain

stream; and in the plaintiffs' hands, within the limitations of the grant, it could not be overthrown by the exercise of another branch of the sovereignty of only equal and no greater force. It is true, that the shares in a corporation are property, but the franchise is not. It cannot be taken to respond to any liabilities of the corporation, and can only be extinguished by forfeiture. It is entirely unlike a grant of land, to which the State court compare it, in this, — this is a grant of royal prerogative, or branch of sovereignty; whereas, when land is granted, all the powers of sovereignty, to enforce the laws, levy taxes, and in all other respects, remain still in the State over the granted territory.

II. All the powers of the States, as sovereign States, must always be subject to the limitations expressed in the United States Constitution, nor can they any more be permitted to overstep such limitations of power by the exercise of one branch of sovereignty than another. What is forbidden to them, and which they cannot do directly, they should not be permitted to do by color, pretence, or oblique indirection. Among other matters limiting and restricting State sovereignty is this: — No State shall pass "any law impairing the obligation of contracts." The power of eminent domain, like every other sovereign power in the State, is subject to this limitation and prohibition. Laws creating corporations, with powers for the benefit of the individual corporators, even though for public purposes, like turnpikes, railroads, toll-bridges, &c., have always, and by almost every court in the Union, and by this court, been decided to be contracts between the government and the corporators. The plaintiffs' grant and franchise was a contract of the State for one hundred years, and by this act of 1839, and the proceedings under it, that contract is not only impaired, but utterly destroyed; and this a State can no more do under the power of eminent domain, than under the law-making power, or any other power of sovereignty. It is said, the citizen is safe, because, under the exercise of the eminent domain, he is to receive compensation for whatever is taken. That furnishes no security, for the mode and amount of compensation is fixed ex parte by the government and its agents; and, besides that, the prohibition of the Constitution is general, and contains no exception for this exercise of this power of eminent domain as to contracts.

If the provision of the Constitution, which forbids the impairing of contracts, does not extend to the contracts of the State governments, and they are left subject to be destroyed by the eminent domain, then there is an end of public faith. It is said, by every writer, and by almost every court which has

passed on this subject, the eminent domain, that it must rest with "the legislative power to determine when public uses require the assumption of private property," and to regulate the mode of compensation. (2 Kent's Comm. 340.) If to this it be holden that this extends even to contracts of the government itself, then it follows, that the State of Mississippi, or any other State indebted, has but by law to declare that the public good requires that the State debts, bonds, &c., shall be taken for the public use, and appoint commissioners to fix their present market value to the holders, and, on payment thereof, declare them extinguished. Such is the real character of this transaction.

III. The power or authority exercised under the State in this case was this: under the pretence of laying a new highway, where none was required, and none, in fact, laid, they have taken a franchise, and abolished the tolls of a chartered bridge. By the statute of 1839, under which this proceeding is attempted to be justified, it is provided, "whenever there shall be occasion for any new highway," &c.; &c. In this case, it appears that there had been there a highway from 1796, and this bridge was built in that highway, and this public stage-road was followed by the commissioners who made this survey for more than a mile south of this bridge, across it, and two miles north of it, without variation; and this was approved by the court; thus conclusively deciding that no new highway was required there. All that was mere pretence and fiction, and shown by the record to be false. Let us now reduce to undisguised English that statute of the State, as it was construed and enforced by the authority exercised under the State in this case. Whenever any toll-bridge heretofore granted becomes of any value to the proprietors, and thereby obnoxious to the inhabitants of the vicinity, they may present a petition to their County Court, and therein falsely pretend that a new highway is there needed, and the court shall appoint commissioners, of their own selecting, who may pretend to lay out a new highway, but really only follow the old one across the bridge, and appraise the damage to the proprietors of the bridge; and the court may thereupon declare and adjudge, that all tolls at said bridge cease on said sum being paid, though the time of the grant has not expired, and though the sum does not equal half the value of the franchise. This would be, in substance, enacting, that "hereafter no tolls shall be paid for passing West River Bridge, the same being hereby abolished, because they are offensive to the vicinity, and the proprietors shall receive such gross sum as persons selected *ex parte* by the vicinity or State shall decide." All this is but destroying

The West River Bridge Company v. Dix et al.

the contract by which the franchise was created, under the color and pretence of exercising the eminent domain. Chancellor Kent, in treating of this power of eminent domain, says: — "If they should vacate a grant of property or of a franchise, under a pretext of some public use or service, such cases would be abuses of their discretion, and fraudulent attacks on private rights, and the law be clearly unconstitutional and void." (2 Kent's Comm. 340.)

IV. It has been holden in every State, where the point has arisen, and before judges of this court, that every turnpike, railroad, or toll-bridge, though made by a corporation, still is a highway, and an erection for public use; and therefore a clause in such grant to take private property, making compensation therefor, without consent of the owner, for such highway, is a legitimate exercise of the power of eminent domain. When, therefore, this power has been exercised, or the delegation of its exercise has been granted to the corporation and been used, and the private property been taken and devoted to the public use, the power has exhausted itself on the subject. All that remains is the contract of the State with the corporation, that is, that the erection shall be sustained by the corporation for public use, and compensation received therefor by the receipt of certain tolls. Now, can the State impair and abolish this contract by again exercising the power of eminent domain on the subject? Can the State say to the corporation, We delegate to you, for good consideration, the power of eminent domain in taking property to make a road or bridge for public use; and when this is done, then say, We will again assume and exercise over you the very same power we delegated and sold to you?

V. It is not necessary now to inquire whether, for the purpose of making some new, extensive, and continuous highway, canal, or railroad, which the public good required, and which required the including within it some short turnpike, railroad, or toll-bridge previously granted, such turnpike, or bridge, or railroad might not be legitimately merged in the greater object. Nor is it necessary, in this case, to decide whether this bridge and franchise might not be taken and destroyed to prevent public invasion, or to convert into a fortification, or for any different public use from that to which it is already appropriated. This case is of a very distinct character, and cannot be properly confounded with such cases. This bridge was erected in a highway, constitutes a part of that highway, and is devoted exclusively to the public use as a highway; nor can the proprietors deprive any one of the right of so using it. The attempted proceeding is, not to appropriate it to any new public

use, but to keep it devoted to precisely the same use, but only to abolish the tolls, which by contract belong to the plaintiff.

It is said by the State court, that this is the same as a grant of land. Let us, then, supposing this to be so, inquire whether a State, having, for good consideration, granted land in fee-simple for the grantee to use, occupy, improve, and to sell to others for the same purpose, can, under the power of eminent domain, in any form, take that land from the owner, and compel him to receive a sum which the State's commissioners shall state, for the purpose of using, by the State, the same for the same purposes it was used before by the owner; and to sell or grant to others, for the same purposes and uses. If this be so, there is no limitation to this power; for, as the legislature alone have the right to determine when and what private property shall be taken for the public use, if there be superadded, that they also shall determine what is public use, it must follow that what courts have often said, a State could not take one man's property and give it to another, is not true; for they have but to declare that they will take it for the use of the State, and then grant it to others for a greater price or better cultivation; or take the lands of all for an agrarian operation for the public benefit. If these tolls are abolished by this proceeding, what prevents the State from granting the same charter to some political favorite to-morrow?

It should be here observed, that the public can obtain no pecuniary benefit by this or any similar operation, nor be relieved of any burden thereby, except what is derived by fraudulently or coercively imposing on the other party an insufficient compensation, as in this case. What the plaintiff ought justly to receive was the value of the franchise, that is, that sum which the tolls would have yielded him beyond the expense of sustaining the bridge. If the public justly pay the plaintiff that sum, and then support the bridge, their outlay is precisely the same as if they left the plaintiff to sustain the bridge, and paid the tolls. Unjust oppression can be the only object of this proceeding.

This power, the eminent domain, which only within a few years was first recognized and naturalized in this country, is unknown to our Constitution or that of the States. It has been adopted from writers on other and arbitrary governments, and goes on the ground, that all the powers heretofore regarded as the incidents of sovereignty must be existing in some department of State authority, which is far from true. But being now recognized in court, our only security is to be found in this tribunal, to keep it within some safe and well-defined limits, or our State governments will be but unlimited despot-

isms over the private citizens. They will soon resolve themselves into the existing will of the existing majority, as to what shall be taken, and what shall be left to any obnoxious natural or artificial person. It is easy to see, that, by a very slight improvement on the proceedings in this case, and in pursuance of the avowed principle, that, as to the exercise of this power of eminent domain, the legislature, or their agents, are to be the sole judges of what is to be taken, and to what public use it is to be appropriated, the most levelling ultraisms of Antirentism or agrarianism or Abolitionism may be successfully advanced.

*Mr. Phelps,* for defendants in error.

In the year 1795, the plaintiffs in error were made a corporation by act of the legislature of the State of Vermont, and, by said act, had granted to them the exclusive privilege of erecting and maintaining a bridge over West River, within four miles of its mouth, with the right of taking certain tolls for passing the same. This franchise was to continue for the term of one hundred years, and has not yet expired. The company proceeded to erect their bridge, and have maintained it until the institution of the proceeding in question, and have, during all that time, been in the enjoyment of the franchise so granted. In 1842, a proceeding was instituted in the County Court for the county of Windham, within which said bridge was situated, under a general law of the State of Vermont for the laying out and opening highways, by which proceeding the bridge was made a public and free highway, and the right to take tolls extinguished. This was effected by the judicial determination of a court of competent jurisdiction. In conformity with the provisions of the statute, the whole property of the plaintiffs, both realty and franchise, was appraised, and due provision made for compensation to the plaintiffs to the full value of the same.

By a statute of that State, then and still in force (passed November, 1839), the Supreme and County Courts have the same power to take any real estate, easement, or franchise, of any turnpike or other corporation, when, in their judgment, the public good requires a public highway, which they have by law to lay out highways over individual or private property.

The plaintiffs in error now seek to reverse the proceedings and judgment of the State court, upon the ground that the above-mentioned statute, so far as it professes to authorize the extinguishment of their franchise, is unconstitutional and void.

The Constitution of the United States and that of the State

44*

of Vermont both recognize the right to take private property for public use. The latter declares : —

"That private property ought to be subservient to public uses when necessity requires it; nevertheless, whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."

This provision, as well as the similar one in the Constitution of the United States, does not confer the power, but merely limits its exercise.

The power itself is an essential and indispensable attribute of sovereignty, which can be neither alienated nor abridged by ordinary legislation.

Without the limitation imposed by the Constitution, it might be exercised without compensation. Gov., &c., of Cast Plate Manuf. Co. *v.* Meredith, 4 T. R. 794; Stark *v.* McGowen, 1 Nott & McCord, S. C. R. 387.

Full compensation to the plaintiffs having been provided in this case, the proceeding does not conflict with the constitution of Vermont.

Nor with that of the United States, as the provision in that instrument is not restrictive of the States, but of the general government only.

The proceeding, then, being a regular and legitimate exercise of power, warranted by the constitution of the State, the question arises, Does it conflict with that provision in the Constitution of the United States which prohibits a State from passing a law impairing the obligation of contracts? And this question resolves itself into another, namely, Does this provision of the Constitution override, annul, or abrogate the right of eminent domain, as it would otherwise exist in the sovereignty of the respective States?

For if this power is still supposed to exist, notwithstanding this clause of the Constitution, then its legitimate exercise cannot conflict with that provision.

All real estate is held, or supposed to be held, by grant from the State. If it cannot be taken for public use in a proper case, and in a proper way, under the restriction of the State constitution, then it cannot be taken at all, and the right of eminent domain is gone.

That this right still remains in the several States is not now to be questioned. Rogers *v.* Bradshaw, 20 Johns. 742 ; Beekman *v.* Sar. and Schen. Railroad Co., 3 Paige's C. R. 45 ; Boston Water Power Co. *v.* Boston and Worcester Railroad Co., 23 Pick. 360 ; 15 Verm. 745 ; Charles River Bridge *v.* Warren Bridge, 7 Pick. 459 ; S. C., 11 Peters, 546.

But there is no need of authorities on this point. The en-

tire practice and universal opinion of the country, judicial and extra-judicial, from the adoption of the Constitution to this day, have settled the matter. .

It is not to be supposed, that the purpose of this restriction was to extinguish a power in the several State sovereignties so essential to the exercise of their functions.

If, then, this proceeding is obnoxious to the objection of violating the Constitution, it must be for some other reason than because private property, once granted by the State, has been resumed for public use in the manner pointed out by the constitution and laws of the State.

If this restriction does not forbid the exercise of the power, does it limit and control it ?

Unquestionably it does. A grant is a contract, and any thing which defeats or impairs rights growing out of it, in a manner inconsistent with the constitution and laws of the State, may be said to impair its obligation. Thus, to take private property for public use without compensation, where the State constitution forbids such taking, is, doubtless, prohibited by that clause of the Constitution of the United States which provides that no law shall be passed impairing the obligation of contracts.

In order, then, to render the exercise of the right of eminent domain justifiable and consistent with the Constitution of the United States, it is admitted there should be, first, compensation to the owner, where the State constitution requires it ; and, secondly, such necessity for the act as a rational exercise of the power, keeping in view its end and purpose, requires.

As to the compensation, it is in this instance fully provided for. So scrupulous is the law of the State on this point, that not only was the whole property of the plaintiffs compensated for at its appraised value, in this instance, but provision is made by the statute (see Statutes of Vermont, p. 133) for a revision of the subject, in certain cases, by the judicial tribunals.

It was objected before the State court, that no notice was given to the plaintiffs by the commissioners, before proceeding to assess damages.

The State court, doubtless, found that notice was given, as the return of the commissioners so states. But if the fact were otherwise, the omission does not vitiate the proceeding, as the statute just alluded to provides a remedy in such a case.

The value of the plaintiffs' property and the amount of compensation having been ascertained by judicial determination, this court will not inquire whether it was in fact reasonable or not. The adjudication of the State court is conclusive, and an error of judgment, in this particular, would not vitiate the proceeding.

The next inquiry is as to the necessity for the exercise of the power in this instance.

It is admitted that the right to take private property for public use depends upon necessity. Yet that need not be of the most stringent character, — an unavoidable, uncontrollable necessity. It is enough if the public interest or convenience require it; in short, if it be a measure of public expediency.

Upon this principle has the power been exercised in a vast majority of cases throughout the country. All modern improvements in the means of communication stand upon this footing. New roads are substituted for old ones for convenience alone. Canals and railroads are not indispensable; the country may subsist, as it has done, without them; yet they are so intimately connected with the great interests of the country, and have such important bearing upon its prosperity and welfare, that the propriety and legality of the exercise of this right of eminent domain for their establishment have never been doubted.

If the power exist in the State governments, the power of judging of the reasonableness of its exercise in a given case, and of the degree of necessity generally which justifies the appropriation of private property to public use, must exist there also.

This power is admitted to appertain to the State legislatures, and may, without question, be delegated by them to the judicial tribunals, as it is often delegated to private corporations and mere executive officers. When exercised by the latter, it is of course subject to judicial revision and control. Upon this ground stands the proceeding in chancery in the State court, which has been brought hither by writ of error.

This judicial function must be vested somewhere, and from the very nature of it, it having reference to a matter of mere internal and domestic policy, it must be in the State government.

The decision of the State court is therefore, upon this point, conclusive, and the necessity for the exercise of the power in this case is judicially established.

If, then, the power has been exercised agreeably to the provision of the State constitution, and upon sufficient necessity, for proper and rational objects, and in a proper and legal manner, the plaintiffs are driven to the alternative of either admitting the constitutionality and validity of the proceeding, or denying the power altogether. For, if such an exercise of it be forbidden by the prohibition in the Constitution of the United States, all and every exercise of it is equally so.

But that prohibition was not intended to override or abro-

gate the right of eminent domain. The latter remains full, ample, and unimpaired, to be exerted in a sound legislative and judicial discretion, in proper cases and for proper ends.

The proceeding in question does not impair the obligation of the grant to the plaintiffs in 1795.

Every grant of this kind is made subject to the right of eminent domain, and of course upon the implied condition that the property may be resumed for public use whenever the public necessities require it. This is universally admitted in respect to land, and I shall endeavour to show that there is no difference in this respect between land and a franchise like the one in question. The resumption, therefore, whenever the public exigencies require it, is in harmony with the original intent and tenor of the grant.

It is not an attempt to repeal or annul the grant, but the proceeding recognizes its validity and the rights derived from it. It is on this ground that compensation is made.

It is a purchase by the State of the plaintiffs' franchise, and may be illustrated by its analogy to a purchase by a grantor of a title derived originally from his own conveyance.

It is, I am aware, a proceeding *in invitum;* but, being a purchase, it is no more in derogation of the grant, than the course of a creditor who, by virtue of legal process, seizes property of his debtor held by force of a conveyance from himself, is in derogation of that conveyance.

Whether the right of a State to compel a sale from the plaintiffs to itself is derived from an implied condition in the grant, or from a power inherent in its sovereignty, is unimportant; if legally effected, it is a sale and purchase after all, and is no more inconsistent with the original grant than if made voluntarily by the plaintiffs.

It does not impair the obligation of the contract, because it leaves to the plaintiffs the full benefit of the grant; and if they cannot enjoy that benefit in the precise form originally specified, they take what, in the eye of the law, is the same thing, an equivalent. The franchise is extinguished but is extinguished by purchase; and if any injustice is done, it must consist rather in the arbitrary and unnecessary exercise of an acknowledged power, than in any denial or impeachment of the validity of the grant, or the rights derived from it. The proceeding, instead of questioning or impairing the obligation of the contract, recognizes and affirms it, and gives a compensation upon the simple and only ground, that the rights and property of the plaintiffs derived from the grant are not to be questioned.

The general power of the State to reclaim, for public use,

lands which have been granted to individuals, will not be questioned; but the question has been agitated elsewhere, and may be started here, whether a franchise granted to private persons for their private emolument, and yet for a public use, is not beyond the reach of that power. These cases being of a mixed character, combining private right and emolument with public convenience, the question resolves itself into two others, viz. : —

1st. Are private rights thus conferred of any superior sanctity? And,

2d. Does the partial, qualified, and limited appropriation of the property to public use exclude the further exercise of the right of eminent domain?

It is impossible, we think, to make any distinction between franchises thus granted, and titles to land derived from letters-patent. The same sovereign power exists. The same great law of public necessity, demanding that private right should yield to public exigency, applies to both.

The distinction attempted to be drawn from the supposition, that the citizen takes his grant of land knowing and expecting that it may be resumed for public use, but receives his grant of a franchise with different expectations, is evidently a distinction without a difference, as it is based upon an assumption in every point of view erroneous.

The exercise of this right of eminent domain over franchises created by special grant is a common occurrence. Bridges are substituted for ferries; turnpikes are superseded by railroads and canals; yet, frequent as this occurrence is, it has rarely been contested.

The power of the legislature to take franchises, like other property, for public use, has never, to my knowledge, been judicially denied. On the contrary, it has often been judicially asserted. See Armington *v.* Barnet, 15 Verm. 745.

In Rogers *v.* Bradshaw, 20 Johns. 742, the canal encroached upon and took a portion of the turnpike, and the latter encroached upon the adjoining land; yet the right of the State was sustained.

In the case of Charles River Bridge *v.* Warren Bridge, the ferry, which was the property of a private corporation, was superseded by the bridge.

In the case between the Boston Water Power Company and the Worcester Railroad, 23 Pick. 360, the power of the legislature over franchises is expressly asserted. In that case the franchise was not, indeed, annihilated, but was diminished in value, and impaired. If the legislature could take a portion of the franchise, they could doubtless take the whole, if the exigency required it.

*Mr. Phelps* here adverted to the case of Charles River Bridge *v.* Warren Bridge, 7 Pickering, to show the opinions entertained on this point at the bar and on the bench. See pp. 394, 399, 452, 453, 500, 513, 522, 523, 528. Also, to same case, 11 Peters, pp. 472, 490, 505, 569, 579, 580, 638, 641, 644, 645.

He also cited Tuckahoe Canal Co. *v.* The James River Railroad Co., 11 Leigh, 42; Enfield Bridge Co. *v.* Hartford and New Haven Railroad Co., 17 Conn. 40, 60; same case, pp. 457, 461; 8 N. Hamp. 398.

It is to be borne in mind, that the real estate of the plaintiffs was not derived from the grant of 1795, nor was it acquired by the aid of the power of the State; no authority being conferred by that act to take private property without the owner's assent.

The taking the land, therefore, if it conflict with any grant, conflicts with the original grant from the British crown, made prior to the Revolution. If it come in collision with the grant of the franchise, it is only incidentally and consequentially.

Unless, then, the legislature, by the grant of the franchise in 1795, parted with the right of eminent domain over the place where the franchise was to be exercised, the taking the land for public use must be conceded to be lawful.

If, then, the land can be taken, could not the same power take the franchise, which is merely incident to it?

If we advert to the act of 1795, we shall find that the franchise consists in the right to take toll upon a bridge, to be maintained by the plaintiffs, upon their own land, and at their own expense. Now, if the bridge itself passes from them in a legal way, and they cease to maintain it, the right to take toll ceases.

The case, then, is not one in which the grant of the franchise is revoked or annulled by the legislature in bad faith, but one in which, the public having acquired the rights of the plaintiffs, the further exercise of the franchise is neither reasonable nor just.

It was argued in the court below, that the franchise is not annexed to land, and therefore ".could not be taken, but where the right is given to take land."

The franchise, by the grant, might be exercised at any place within four miles of the mouth of the river. The proceeding in question merely prohibits its exercise in this particular place, leaving it to be enjoyed elsewhere, if it be of any value to the plaintiffs. In this view, the case falls precisely within the decision in the Boston Water Power Company *v.* Worcester Railroad, 23 Pick. 360.

The plaintiffs, however, had given a location to it, and its exercise elsewhere being probably of no value, the case was treated by the State court as a practical extinguishment of it, and compensation made accordingly.

In this view of the matter, the franchise still subsists, impaired only by the establishment of a public highway in this particular place.

Does the partial and qualified appropriation of the plaintiffs' property to public use exclude the exercise of the right of eminent domain by the State?

It is to be observed, that the land of the plaintiffs had never been taken by the sovereign power for public use until the proceeding now in question was instituted. It was voluntarily devoted to that use by the plaintiffs, with a view to the enjoyment of the franchise.

The property is still private, and the public use it only by paying an equivalent, in the form of toll.

Were it otherwise, it would be difficult to make out that a partial exercise of the right of eminent domain exhausts the power, or that, property being devoted to public use, the sovereign power cannot regulate, modify, or control that use. The fact of such devotion comes rather in aid, than otherwise, of the public right.

Whether, therefore, we have regard to the fact that the property is private, or to the qualified public use, there is no impediment to taking it absolutely for a more enlarged and beneficial public use, on the one hand, and modifying or changing the use on the other.

There is no difficulty arising from the fact, that the property is already sequestered to public use; but the difficulty has arisen, as the reported cases show, from the employment of private corporations to exercise the power in question, and to carry out these great measures of internal improvement. The objection was first started, that, in the case of turnpike and railroad corporations, the property of the citizen has been taken, not for public use, but for the private use and benefit of the corporation. The proceeding has, however, been sustained, upon the ground, that, although the enterprise has been undertaken with a view to private emolument, yet the ultimate purpose is the public convenience; and if the legislative power can take private property for such purposes, it may be taken through the agency of a corporation, as well as that of a public executive officer. So, where a grant of a franchise comes in collision with a previous grant of a similar kind, it has been objected, that it was not competent for the legislature to take the property of one person for the use and benefit of another; yet such

a proceeding has been sustained, where it is for public use, and the increased benefit to the public requires the sacrifice.

Our case, however, is free from this objection. The property has been taken, not for the benefit of another private corporation, but strictly and solely for public use.

The objection urged in the State court, that no new highway is laid out, is founded upon an erroneous assumption. The public and free highway is, in a legal sense, a different thing from a bridge, or way, which is private property, and which the citizens may use only for a toll, to be paid in each instance of using.

The highway was public only in a limited sense. That it was competent for the legislature or the courts, under the statute, to enlarge the public use, is, I think, clear.

If the objection is, that no new highway was necessary, inasmuch as the public had already a right of passage there, and could use the way as they had previously done, the answer is, that the power of the courts over this matter is not limited to cases of strict, absolute necessity, but they are at liberty to consult the public convenience, and to look to a more beneficial and enlarged public use. They are the constitutional judges on this point, and their decision upon it is conclusive.

The statute of Vermont, under which the court proceeded, does not use the word *necessity*. Its language is, " Whenever there shall be occasion for a new highway," &c., and " when, in their [the court's] judgment, the public good requires a public highway."

There are several points made in the State courts, which are addressed rather to the discretion of those courts, and which have no bearing upon the constitutional question; it is not deemed necessary to notice them here.

Mr. Justice DANIEL delivered the opinion of the court.

The West River Bridge Company, Plaintiffs, *vs.* Joseph Dix and the Towns of Brattleborough and Dummerston, Defendants, upon a writ of error to the Supreme Court of Judicature of the State of Vermont, sitting in certain proceedings as a court of law,

and

The same Plaintiffs, *vs.* The Towns of Brattleborough and Dummerston, and Joseph Dix, Asa Boyden, and Phineas Underwood, upon a writ of error to the Supreme Court of Judicature, and to the Chancellor of the First Circuit of the State of Vermont.

These two causes have been treated in the argument as one,

—and such they essentially are. Though prosecuted in different forms and in different forums below, they are merely various modes of endeavouring to attain the same end, and a decision in either of the only question they raise for the cognizance of this court disposes equally of that question in the other.

They are brought before us under the twenty-fifth section of the Judiciary Act, in order to test the conformity with the Constitution of the United States of certain statutes of Vermont; laws that have been sustained by the Supreme Court of Vermont, but which it is alleged are repugnant to the tenth section of the first article of the Constitution, prohibiting the passage of State laws impairing the obligation of contracts.

It appears from the records of these causes, that, in the year 1795, the plaintiffs in error were, by act of the legislature of Vermont, created a corporation, and invested with the exclusive privilege of erecting a bridge over West River, within four miles of its mouth, and with the right of taking tolls for passing the same. The franchise granted this corporation was to continue for one hundred years, and the period originally prescribed for its duration has not yet expired. The corporation erected their bridge, have maintained and used it, and enjoyed the franchise granted to them by law, until the institution of the proceeding now under review.

By the general law of Vermont relating to roads, passed 19th November, 1839, (vide Revised Laws of Vermont, p. 553,) the County Courts are authorized, upon petition, to appoint commissioners to lay out highways within their respective counties, and to assess the damages which may accrue to landholders by the opening of roads, and these courts, upon the reports of the commissioners so appointed, are empowered to establish roads within the bounds of their local jurisdiction. A similar power is vested in the Supreme Court, to lay out and establish highways extending through several counties.

By an act of the legislature of Vermont, passed November 19th, 1839, it is declared, that "whenever there shall be occasion for any new highway in any town or towns of this State, the Supreme and County Courts shall have the same power to take any real estate, easement, or franchise of any turnpike or other corporation, when in their judgment the public good requires a public highway, which such courts now have, by the laws of the State, to lay out highways over individual or private property; and the same power is granted, and the same rules shall be observed, in making compensation to all such corporations and persons whose estates, easement, franchise, or rights shall be taken, as are now granted and provided in other

cases." Under the authority of these statutes, and in the modes therein prescribed, a proceeding was instituted in the County Court of Windham, upon the petition of Joseph Dix and others, in which, by the judgment of that court, a public road was extended and established between certain termini, passing over and upon the bridge of the plaintiffs, and converting it into a free public highway. By the proceedings and judgment just mentioned, compensation was assessed and awarded to the plaintiffs for this appropriation of their property, and for the consequent extinguishment of their franchise. The judgment of the County Court, having been carried by certiorari before the Supreme Court of the State, was by the latter tribunal affirmed.

Pending the proceedings at law upon the petition of Dix and others, a bill was presented by the plaintiffs in error to the chancellor of the first judicial circuit of the State of Vermont, praying an injunction to those proceedings so far as they related to the plaintiffs or to the real estate, easement, or franchise belonging to them. This bill, having been demurred to, was dismissed by the chancellor, whose decree was affirmed on appeal to the Supreme Court, and a writ of error to the last decision brings up the case on the second record.

In considering the question propounded in these causes, there can be no doubt, nor has it been doubted in argument, on either side of this controversy, that the charter of incorporation granted to the plaintiffs in 1793, with the rights and privileges it declared or implied, formed a contract between the plaintiffs and the State of Vermont, which the latter, under the inhibition in the tenth section of the first article of the Constitution, could have no power to impair. Yet this proposition, though taken as a postulate on both sides, determines nothing as to the real merits of these causes. True, it furnishes a guide to our inquiries, yet leaves those inquiries still open, in their widest extent, as to the real position of the parties with reference to the State legislation or to the Constitution. Following the guide thus furnished us, we will proceed to ascertain that position. No State, it is declared, shall pass a law impairing the obligation of contracts; yet, with this concession constantly yielded, it cannot be justly disputed, that in every political sovereign community there inheres necessarily the right and the duty of guarding its own existence, and of protecting and promoting the interests and welfare of the community at large. This power and this duty are to be exerted not only in the highest acts of sovereignty, and in the external relations of governments; they reach and comprehend likewise the interior polity and relations of social life, which should be regulated with

reference to the advantage of the whole society. This power, denominated the *eminent domain* of the State, is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yield in every instance to its proper exercise.

The Constitution of the United States, although adopted by the sovereign States of this Union, and proclaimed in its own language to be the supreme law for their government, can, by no rational interpretation, be brought to conflict with this attri-. bute in the States; there is no express delegation of it by the Constitution; and it would imply an incredible fatuity in the States, to ascribe to them the intention to relinquish the power of self-government and self-preservation. A correct view of this matter must demonstrate, moreover, that the right of eminent domain in government in no wise interferes with the inviolability of contracts; that the most sanctimonious regard for the one is perfectly consistent with the possession and exercise of the other.

Under every established government, the tenure of property is derived mediately or immediately from the sovereign power of the political body, organized in such mode or exerted in such way as the community or State may have thought proper to ordain. It can rest on no other foundation, can have no other guarantee. It is owing to these characteristics only, in the original nature of tenure, that appeals can be made to the laws either for the protection or assertion of the rights of property. Upon any other hypothesis, the law of property would be simply the law of force. Now it is undeniable, that the investment of property in the citizen by the government, whether made for a pecuniary consideration or founded on conditions of civil or political duty, is a contract between the State, or the government acting as its agent, and the grantee; and both the parties thereto are bound in good faith to fulfil it. But into all contracts, whether made between States and individuals or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the preëxisting and higher authority of the laws of nature, of nations, or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. Such a condition is the right of emi-

nent domain.   This right does not operate to impair the contract effected by it, but recognizes its obligation in the fullest extent, claiming only the fulfilment of an essential and inseparable condition.   Thus, in claiming the resumption or qualification of an investiture, it insists merely on the true nature and character of the right invested.   The impairing of contracts inhibited by the Constitution can scarcely, by the greatest violence of construction, be made applicable to the enforcing of the terms or necessary import of a contract; the language and meaning of the inhibition were designed to embrace proceedings attempting the interpolation of some new term or condition foreign to the original agreement, and therefore inconsistent with and violative thereof.   It, then, being clear that the power in question not being within the purview of the restriction imposed by the tenth section of the first article of the Constitution, it remains with the States to the full extent in which it inheres in every sovereign government, to be exercised by them in that degree that shall by them be deemed commensurate with public necessity.   So long as they shall steer clear of the single predicament denounced by the Constitution, shall avoid interference with the obligation of contracts, the wisdom, the modes, the policy, the hardship of any exertion of this power are subjects not within the proper cognizance of this court.   This is, in truth, purely a question of power; and, conceding the power to reside in the State government, this concession would seem to close the door upon all further controversy in connection with it.   The instances of the exertion of this power, in some mode or other, from the very foundation of civil government, have been so numerous and familiar, that it seems somewhat strange, at this day, to raise a doubt or question concerning it.   In fact, the whole policy of the country, relative to roads, mills, bridges, and canals, rests upon this single power, under which lands have been always condemned; and without the exertion of this power, not one of the improvements just mentioned could be constructed.   In our country, it is believed that the power was never, or, at any rate, rarely, questioned, until the opinion seems to have obtained, that the right of property in a chartered corporation was more sacred and intangible than the same right could possibly be in the person of the citizen; an opinion which must be without any grounds to rest upon, until it can be demonstrated either that the ideal creature is more than a person, or the corporeal being is less.   For, as a question of the power to appropriate to public uses the property of private persons, resting upon the ordinary foundations of private right, there would seem to be room neither for doubt nor difficulty.   A dis-

45*

tinction has been attempted, in argument, between the power of a government to appropriate for public uses property which is corporeal, or may be said to be in being, and the like power in the government to resume or extinguish a franchise. The distinction thus attempted we regard as a refinement which has no foundation in reason, and one that, in truth, avoids the true legal or constitutional question in these causes; namely, that of the right in private persons, in the use or enjoyment of their private property, to control and actually to prohibit the power and duty of the government to advance and protect the general good. We are aware of nothing peculiar to a franchise which can class it higher, or render it more sacred, than other property. A franchise is property, and nothing more; it is incorporeal property, and is so defined by Justice Blackstone, when treating, in his second volume, chap. 3, page 20, of the Rights of Things. It is its character of property only which imparts to it value, and alone authorizes in individuals a right of action for invasions or disturbances of its enjoyment. *Vide* Bl. Comm., Vol. III., chap. 16, p. 236, as to injuries to this description of private property, and the remedies given for redressing them. A franchise, therefore, to erect a bridge, to construct a road, to keep a ferry, and to collect tolls upon them, granted by the authority of the State, we regard as occupying the same position, with respect to the paramount power and duty of the State to promote and protect the public good, as does the right of the citizen to the possession and enjoyment of his land under his patent or contract with the State, and it can no more interpose any obstruction in the way of their just exertion. Such exertion we hold to be not within the inhibition of the Constitution, and no violation of a contract. The power of a State, in the exercise of eminent domain, to extinguish immediately a franchise it had granted, appears never to have been directly brought here for adjudication, and consequently has not been heretofore formally propounded from this court; but in England, this power, to the fullest extent, was recognized in the case of the Governor and Company of the Cast Plate Manufacturers *v.* Meredith, 4 Term Reports, 794, and Lord Kenyon, especially in that case, founded solely upon this power the entire policy and authority of all the road and canal laws of the kingdom.

The several State decisions cited in the argument, from 3 Paige's Chancery Reports, p. 45, from 23 Pickering, p. 361, from 17 Connecticut Reports, p. 454, from 8 New Hampshire Reports, p. 398, from 10 New Hampshire Reports, p. 371, and 11 New Hampshire Reports, p. 20, are accordant with the decision above mentioned, from 4 Durnford and East, and entirely

supported by it. One of these State decisions, namely, the case of the Enfield Toll-Bridge Company *v.* The Hartford and New Haven Railroad Company, 17 Connecticut Reports, places the principle asserted in an attitude so striking, as seems to render that case worthy of a separate notice. The legislature of Connecticut, having previously incorporated the Enfield Bridge Company, inserted, in a charter subsequently granted by them to the Hartford and Springfield Railroad Company, a provision in these words, — "That nothing therein contained shall be construed to prejudice or impair any of the rights now vested in the Enfield Bridge Company." This provision, comprehensive as its language may seem to be, was decided by the Supreme Court of the State as not embracing any exemption of the Bridge Company from the legislative power of eminent domain, with respect to its franchise, but to declare this, and this only, — that, notwithstanding the privilege of constructing a railroad from Hartford to Springfield in the most direct and feasible route, granted by the latter charter, the franchise of the Enfield Bridge Company should remain as inviolate as the property of other citizens of the State. These decisions sustain clearly the following positions, comprised in this summary given by Chancellor Walworth, 3 Paige's Reports, p. 73, where he says, that, "notwithstanding the grant to individuals, the eminent domain, the highest and most exact idea of property, remains in the government, or in the aggregate body of the people in their sovereign capacity; and they have a right to resume the possession of the property in the manner directed by the constitution and laws of the State, whenever the public interest requires it. This right of resumption may be exercised, not only where the safety, but also where the interest, or even the expediency, of the State is concerned." In these positions, containing no exception with regard to property in a franchise (an exception which we should deem to be without warrant in reason), we recognize the true doctrines of the law as applicable to the cases before us. In considering the question of constitutional power, — the only question properly presented upon these records, — we institute no inquiry as to the adequacy or inadequacy of the compensation allowed to the plaintiffs in error for the extinguishment of their franchise; nor do we inquire into the conformity between the modes prescribed by the statutes of Vermont and the proceedings which actually were adopted in the execution of those statutes; these are matters regarded by this court as peculiarly belonging to the tribunals designated by the State for the exercise of her legitimate authority, and as being without the province assigned to this court by the Judiciary Act.

Upon the whole, we consider the authority claimed for the State of Vermont, and the exertion of that authority which has occurred under the provisions of the statutes above mentioned, by the extinguishment of the franchise previously granted the plaintiffs, as set forth upon the records before us, as presenting no instance of the impairing of a contract, within the meaning of the tenth section of the first article of the Constitution, and consequently no case which is proper for the interposition of this court. The decisions of the Supreme Court of Vermont are therefore affirmed.

Mr. Justice McLEAN.

As this is a constitutional question of considerable practical importance, I will state, succinctly, my general views on the subject.

The West River Bridge, under the statutes of Vermont, was appropriated to public purposes. And it is alleged that the charter under which the bridge was built and possessed by such appropriation was impaired. Our inquiry is limited to this point. For whatever injury the proceeding may have done to the interests of the corporation, unless its contract with the State was impaired, we have no jurisdiction of the case.

The power in a State to take private property for public use is undoubted. It is an incident to sovereignty, and its exercise is often essential to advance the public interests. This act is done under the regulations of the State. If those regulations have not been strictly observed, that is not a matter of inquiry for this court. The local tribunals have the exclusive power in such cases.

This act by a State has never been held to impair the obligations of the contract by which the property appropriated was held. The power acts upon the property, and not on the contract. A State cannot annul or modify a grant of land fairly made. But it may take the land for public use. This is done by making compensation for the property taken, as provided by law. But if it be an appropriation of property to public use, it cannot be held to impair the obligations of the contract.

It is insisted, that this was a pretended exercise of the power of the eminent domain, with the view of destroying the force and obligation of the plaintiffs' charter.

This whole proceeding was under a standing law of the State, and it was sanctioned, on an appeal, by the Supreme Court of the State. A procedure thus authorized by law, and sanctioned, cannot be lightly regarded. It has all the solemnities of a sovereign act.

But it is said that the franchise of the plaintiff cannot be denominated property ; that "it included the grant of no property real or personal ; that it lay in grant, and not in livery."

If the action of the State had been upon the franchise only, this objection would be unanswerable. The State cannot modify or repeal a charter for a bridge, a turnpike-road, or a bank, or any other private charter, unless the power to do so has been reserved in the original grant. But no one doubts the power of the State to take a banking-house for public use, or any other real or personal property owned by the bank. In this respect, a corporation holds property subject to the eminent domain, the same as citizens. The great object of an act of incorporation is, to enable a body of men to exercise the faculties of an individual. Peculiar privileges are sometimes vested in the body politic, with the view of advancing the convenience and interests of the public.

The franchise no more than a grant for land can be annulled by the State. These muniments of right are alike protected. But the property held under both is held subject to a public necessity, to be determined by the State. In either case, the property being taken renders valueless the evidence of right. But this does not, in the sense of the Constitution, impair the contracts. The bridge and the ground connected with it, together with the right of exacting toll, are the elements which constitute the value of the bridge. The situation and productiveness of the soil constitute the value of land. In both cases, an estimate is made of the value, under prescribed forms, and it is paid when the property is taken for public use. And in these cases the evidences of right are incidents to the property.

No State could resume a charter, under the power of appropriation, and carry on the functions of the corporation. A bank charter could not be thus taken, and the business of the bank continued for public purposes. Nor could this bridge have been taken by the State, and kept up by it, as a toll-bridge. This could not be called an appropriation of private property to public purposes. There would be no change in the use, except the application of the profits, and this would not bring the act within the power. The power must not only be exercised *bonâ fide* by a State, but the property, not its product, must be applied to public use.

It is argued, that, if the State may take this bridge, it may transfer it to other individuals, under the same or a different charter. This the State cannot do. It would in effect be taking the property from A to convey it to B. The public purpose for which the power is exerted must be real, not pretended. If in the course of time the property, by a change of

circumstances, should no longer be required for public use, it may be otherwise disposed of. But this is a case not likely to occur. The legality of the act depends upon the facts and circumstances under which it was done. If the use of land taken by the public for a highway should be abandoned, it would revert to the original proprietor and owner of the fee.

It is objected that this bridge, being owned by a corporation and used by the public, does not come within the designation of private property. All property, whether owned by an individual or individuals, a corporation aggregate or sole, is within the term. In short, all property not public is private.

The use of this bridge, it is contended, is the same as before the act of appropriation. The public use the bridge now as before the act of appropriation. But it was a toll-bridge, and by the act it is made free. The use, therefore, is not the same. The tax assessed on the citizens of the town, to keep up and pay for the bridge, may be impolitic or unjust; but that is not a matter for the consideration of this court.

It is supposed, if this power is sustained by the State of Vermont, it will be in the power of a State to seize the evidences of its indebtment in the hands of its citizens, or within its jurisdiction, have their value assessed, and, by paying the amount, extinguish them. Such a case bears no analogy to the one before us. The contract only is acted upon in the case supposed. The obligation to pay the money by the State is materially impaired, which brings the case within the Constitution. But the appropriation of property affects the contract or title by which it is held only incidentally. This, it is said, is an extremely technical distinction, and is not sustainable, as it enables a State to do indirectly what the Constitution prohibits.

However nice the distinction may seem to be, when examined it will be found substantial.

The power of appropriation by a State has never been held by any judicial tribunal as impairing the obligation of a contract, in the sense of the Constitution. And this power has been frequently exercised by all the States, since the adoption of the Constitution. In the fifth article of the amendments to the Constitution it is declared, "Nor shall private property be taken for public use without just compensation." This refers to the action of the federal government, but a similar provision is contained in all the State constitutions. Now the Constitution does not prohibit a State from impairing the obligation of a contract unless compensation be made, but the inhibition is absolute. So that if such an act come within the prohibition, the act is unconstitutional. But this power has been exercised by the States, since the foundation of the government, and no

one has supposed that it was prohibited by that clause in the Constitution which inhibits a State "from impairing the obligations of a contract."

The only reasonable result, therefore, to which we can come is, that the power in the State is an independent power, and does not come within the class of cases prohibited by the Constitution.

This view gives effect to the Constitution in imposing a salutary restraint upon legislation affecting contracts, but leaves the States free in their exercise of the eminent domain, which belongs to their sovereignties, is essential for the advancement of internal improvements, and acts only upon property within their respective jurisdictions. The powers do not belong to the same class. That which acts upon contracts and impairs their obligation only is prohibited.

### Mr. Justice WOODBURY.

In the decisions of this court on constitutional questions it has happened frequently, that, though its members were united in the judgment, great differences existed among them in the reasons for it, or in the limitations on some of the principles involved. Hence it has been customary in such cases to express their views separately. I conform to that usage in this case the more readily, as it is one of the first impression before this tribunal, very important in its consequences, as a great landmark for the States as well as the general government, and, from shades of difference and even conflicts in opinion, will be open to some misconstruction.

I take the liberty to say, then, as to the cardinal principle involved in this case, that, in my opinion, all the property in a State is derived from, or protected by, its government, and hence is held subject to its wants in taxation, and to certain important public uses, both in war and peace. Vattel, B. 1, ch. 20, § 244; 2 Kent, Comm. 270; 37 Am. Jurist, 121; 1 Bl. Comm. 139; 3 Wils. 303; 3 Story on Const. 661; 3 Dallas, 95. Some ground this public right on sovereignty. 2 Kent, Comm. 339; Grotius, B. 1, ch. 1, § 6. Some, on necessity. 2 Johns. Ch. 162; 11 Wend. 51; 14 Wend. 51; 1 Rice, 383; Vanhorne's Lessee v. Dorrance, 2 Dallas, 310; Dyer v. Tuscaloosa Bridge, 2 Porter, 303; Harding v. Goodlett, 3 Yerger, 53. Some, on implied compact. Raleigh & Gaston Railroad Co. v. Davis, 2 Dev. & Bat. 456; 2 Bay, 36, in S. Car.; 3 Yerger, 53. Where a charter is granted after laws exist to condemn property when needed for public purposes, others might well rest such a right on the hypothesis, that such laws are virtually a part and condition of the grant itself, as much as

if inscribed in it, *totidem verbis.* Towne *v.* Smith, 1 Woodbury & Minot, 134; 2 Howard, 608, 617; 1 Howard, 311; 3 Story on Const. §§ 1377, 1378, *quære.*

But, however derived, this eminent domain exists in all governments, and is distinguished from the public domain, as that consists of public lands, buildings, &c., owned in trust exclusively and entirely by the government (3 Kent, Comm. 339; Memphis *v.* Overton, 3 Yerger, 389), while this consists only in the right to use the property of others, when needed, for certain public purposes. Without now going further into the reasons or extent of it, and under whatever name it is most appropriately described, I concur in the views of the court, that it still remains in each State of the Union in a case like the present, having never been granted to the general government so far as respects the public highways of a State, and that it extends to the taking for public use for a road any property in the State, suitable and necessary for it. Tuckahoe Canal case, 11 Leigh, 75; 11 Peters, 560; 20 Johns. 724; 3 Paige, Ch. 45; 7 Pick. 459. But whether it could be taken without compensation, where no provision exists like that in the fifth amendment of the Constitution of the United States, or that in the Vermont constitution, somewhat similar, is a more difficult question, and on which some have doubted. 4 D. & E. 794; 1 Rice, 383; 3 Leigh, 337. I do not mean to express any opinion on this, as it is not called for by the facts of this case. But compensation from the public in such cases prevails generally in modern times, and certainly seems to equalize better the burden. 2 Dallas, 310; Pisc. Bridge *v.* Old Bridge, 7 N. Hamp. 63; 4 D. & E. 794; 1 Nott & McCord, 387; Stokes et al. *v.* Sup. Ass. Co., 3 Leigh, 337; 11 Leigh, 76; Hartford Bridge, 17 Conn. 91; Vattel, B. 1, ch. 20, § 244; 3 Paige, Ch. 45; 2 Dev. & Bat. 451; 2 Kent, Comm. 339, note; Lex. & Oh. Railroad case, 8 Dana, 289.

Nor shall I stop to discuss whether it is on this principle of the eminent domain alone, that private property has always been taken for highways in England, on making compensation, so as to be a precedent for us. This was done there formerly, not as here, but by a writ *ad quod damnum,* and it was for ages issued before the grant of any new franchise by the king, whether a road, ferry, or market; and the inquiry related to the damage by it, whether to the public or individuals. Fitz. N. B. 221; 3 Bac. Abr., *Highways,* A.

Nor were alterations in roads, or even the widening or discontinuing of them, allowed without it. Thomas *v.* Sorrel, Vaughan, 314, 348, 349; Cooke, ch. 267; 6 Barn. & Ald. 566

But in modern times Parliament, by various laws, have authorized all these, after inquiry and compensation awarded by certain magistrates. 1 Burr. 263; Camp. 648; Cro. Car. 266, 267; 5 Taunt. 634; Domat, B. 1, t. 8, § 2; 7 Adol. & Ellis, 124.

And thus, notwithstanding the theoretical omnipotence of Parliament, private rights and contracts have been in these particulars, about compensation and necessity for public use, as much respected in England as here.

So as to railroad companies, as well as turnpikes, under public trustees, and as to common highways; the former are often authorized there to erect bridges, and carry their roads over turnpikes and other highways; but it is on certain conditions, keeping them passable in that place or near, and on making compensation. Kemp v. L. & B. Railway Co., 1 Railway Cases, 505; and Attorney-General v. The L. & S. Railroad, 1 ib. 302, 224; 2 ib. 711; 1 Gale & D. 324; 2 ib. 1; 4 Jurist, 966; 5 ib. 652; 9 Dowling, P. C. 563; 7 Adol. & Ellis, 124; 3 Maule & Selw. 526; 11 Leigh, 42.

But I freely confess, that no case has been found there by me exactly in point for this; such as the taking of the road or bridge of one corporation for another, or of taking for the public a franchise of individuals connected with them. Though, at the same time, I have discovered no prohibition of it, either on principle or precedent, if making compensation and following the mode prescribed by statute.

The peculiarity in the present case consists in the facts, that a part of the property taken belonged to a corporation of the State, and not to an individual, and a part was the franchise itself of the act of incorporation.

I concur in the views, that a corporation created to build a bridge like that of the plaintiffs in error is itself, in one sense, a franchise. 2 Bl. Comm. 37; Bank of Augusta v. Earle, 13 Peters, 596; 4 Wheat. 657; 7 Pick. 394; 11 Peters, 474, 454, 472, 490, 641, 645; 11 Leigh, 76; 3 Kent, Comm. 459. And, in another sense, that it possesses franchises incident to its existence and objects, such as powers to erect the bridge and to take tolls. See same cases.

I concur in the views, also, that such a franchise as the incorporation is a species of property. 7 N. Hamp. 66; Tuckahoe Canal Co. v. Tuckahoe & Camb. Railroad Co., 11 Leigh, 76. It is a legal estate vested in the corporation. 4 Wheat. 700; 11 Peters, 560. But it is often property distinct and independent of the other property in land, timber, goods, or choses in action, which a corporation, like a body not artificial, may own. 3 Bland, 449; 11 Leigh, 76.

It is also property subject to be sold, sometimes even on execution (*Semb.*, 4 Mass. 495; 11 Peters, 434), and may be devised or inherited. 17 Conn. 60. And while I accede to the principle urged by the counsel for the bridge, that the act of incorporation in this case was a contract, or in the nature of one between the State and its members (1 Mylne & Craig, 162; 4 Peters, 514, 560; Lee *v.* Nailer, 2 You. & Coll. 618; King *v.* Pasmoor, 3 D. & E. 246; Woodward *v.* Dartmouth College, 4 Wheat. 628; 7 Cranch, 164; Terrett *v.* Tayler, 9 Cranch, 43, 52; 9 Wend. 351; 11 Peters, 257; Canal Co. *v.* Railroad, 4 Gill & Johns. 146; 3 Kent, Comm. 459; Enfield Toll-Bridge case, 17 Conn. 40; 1 Greenleaf, 79; 8 Wheat. 464; 10 Conn. 522; Peck, 269; 1 Alabama, 23; 2 Stewart, 30), I concur in the views of the court, that this or other property of corporations may be taken for the purpose of a highway, under the right of eminent domain, and that the laws of Vermont authorizing it are not in that respect and to that extent violations of the obligation of any contract made by it with the corporation. Bradshaw *v.* Rodgers, 20 Johns. 103, 742; The Trust. of Belf. Ac. *v.* Salmond, 2 Fairf. 113; Enfield Bridge case, 17 Conn. 40, 45, 61; 3 Paige, Ch. 45; Charles River Bridge *v.* Warren Bridge, 7 Pick. 394, 399; S. C., 11 Peters, 474; 1 Bland, 449; Bellona Co. case, 3 Bland, 449.

Because there was no covenant or condition in the charter or contract, that the property owned by it should not be liable to be taken, like all other property in the State, for public uses in highways. 7 N. Hamp. 69; 4 Wheat. 196; Jackson *v.* Lamphire, 3 Peters, 289.

Because, without such covenant, all their property, as property, must be liable to proper public uses, either by necessity, or the sovereignty of the State over it, or by implied agreement.

And because, on a like principle, taxes may be imposed on such property, as well as all other property, though coming by grant from the State, and may be done without violating the obligation of the contract, when there is no bonus paid or stipulation made in the charter not to tax it. This is well settled. 5 Barn. & Ald. 157; 2 Railway Cases, 17 arg. 23; 7 Cranch, 164; New Jersey *v.* Wilson, 4 Peters, 511; Providence Bank *v.* Billings, 11 Peters, 567, Shaw, C. J., in Charles River Bridge *v.* Warren Bridge; Gordon *v.* Appeal Tax Court, 3 Howard, 146; 12 Mass. 252; 4 Wheaton, 699; 4 Gill & Johns. 132, 153; Williams *v.* Pritchard, 4 D. & E. 2. The grantees are presumed to know all these legal incidents or liabilities, and they being implied in the grant or contract, their happening is no violation of it. 8 Peters, 281, 287; 11 Peters, 641, 644; 3 Paige, 72.

Vattel says, — "The property of certain things is given up to the individuals only with this reserve." B. 1, ch. 20, § 244.

In England anciently, when titles of land became granted with immunities from numerous ancient services, it was still considered that such lands were subject by implication, under a certain *trinoda necessitas*, to the expenses of repair of bridges as well as forts, and of repelling invasion. Tomlins, Dict., *Trinoda Necess.tas ;* 3 Bac. Abr., *Highways,* A.

Even the right to a private way is sometimes implied in a grant, from necessity. Cro. Jac. 189 ; 8 D. & E. 50 ; 4 Maule & Selw. 387 ; 1 Saund. 322, note.

It is laid down, also, by Justice Story, that "a grant of a franchise is not in point of principle distinguishable from a grant of any other property." Dartmouth College *v.* Woodward, 4 Wheat. 699, 701.

I concur, therefore, in the further views, that the corporation as a franchise, and all its powers as franchises, both being property, may for these and like reasons, in proper cases, be taken for public use for a highway. Pierce *v.* Somersworth, 10 N. Hamp. 370 ; 11 N. Hamp. 20 ; Piscat. Bridge *v.* N. Hamp. Bridge, 7 N. Hamp. 35, 66 ; 8 N. Hamp. 398, 143 ; 11 Peters, 645 ; Story J., in Warren Bridge *v.* Charles River Bridge ; 2 Kent, Comm. 340, note ; 2 Peters, 658 ; 5 Paige, Ch. 146 ; 1 Rice, 383 ; 2 Porter, 296 ; 7 Adol. & Ellis, 124 ; 3 Yerger, 41 ; 2 Fairf. 222 ; 23 Pick. 360 ; J. Bonaparte *v.* C. Railroad, Baldw. C. C. 205 ; Tuckahoe Canal Co. *v.* The T. & J. River Railroad Co., 11 Leigh, 42 ; Enfield Bridge Co. *v.* Hartford & New Haven Railroad, 17 Conn. 40 ; Armington *v.* Barnet, 15 Vermont, 745, and 16 Vermont, 446, this case ; 3 Cowen, 733, 754 ; 11 Wendell, 590 ; Lex. & Oh. Railroad case, 8 Dana, 289 ; 18 Wend. 14.

It must be confessed, that some surprise has been felt to find this doctrine so widely sustained; and in so many of the States, and yet no exact precedent existing in England.

But in relation to it here; I am constrained, in some respects, to differ from others, and, as at present advised, agree to the last proposition, concerning the taking of the franchise itself of a corporation, only when the further exercise of the franchise as a corporation is inconsistent or incompatible with the highway to be laid out.

It is only under this limitation as to the franchise itself, that there seems to be any of the necessity to take it which, it will be seen in the positions heretofore and hereafter explained, should exist. Nor do I agree to it with that limitation, without another, — that it must be in cases where a clear intent is manifested in the laws, that one corporation and its uses shall

yield to another, or another public use, under the supposed superiority of the latter and the necessity of the case. 4 Gill & Johns. 108, 150; Barbour *v.* Andover, 8 N. Hamp. 398.

Within these limitations, however, the acts of incorporation and all corporate franchises appear to me to possess no more immunity from reasonable public demands for roads and taxes, than the soil and freehold of individuals.

The land may come by grant or patent from the State, as well as the corporation, and both the grant and corporation may be contracts. But they are contracts giving rights of property, held, and of course understood to be held, subject to those necessary burdens and services and easements to which all other property is liable. And it is neither inconsistent with the grant of them, nor a violation of the contract contained in them, to impose those burdens and easements, unless an express agreement has been made to the contrary by the State in the act of incorporation or grant, as is sometimes done in respect to taxation. But where the corporation, as a franchise, or its powers as franchises, can still be exercised usefully or profitably, and the highway be laid out as authorized, I see no reasons why these franchises should then be condemned or taken. The property owned by a banking or manufacturing corporation may, for instance, be condemned for highways, necessarily, where situated on a great line of travel; but why should their franchises be, if their continued existence and use may be feasible and profitable, and one not inconsistent with the taking and employment of their other property for a public highway?

In this instance, however, as a fact, the franchise was established and seems to be useful only in one locality. The continuance of it elsewhere than at this spot would be of no benefit to individual members or the public. If the bridge itself and land of the corporation at that place were taken, it was better for the latter that the franchise should be taken with them, if enhancing the damages any, because, unlike a bank or manufacturing company, the corporation could not do business to advantage elsewhere, even within the limited four miles, as there was no road elsewhere within their grant. The law of Vermont, too, was clear, that the toll-bridge might be made to give way for a free highway. It is, therefore, only under the particular circumstances and nature of this case, that, in my apprehension, the taking of the franchise itself was not a violation of the contract. For, under different circumstances, if a franchise be taken and condemned for a highway, when not connected locally with other property wanted, when it can be exercised on ordinary principles elsewhere, when not

The West River Bridge Company *v.* Dix et al.

in some respects incident to, or tied up with, the particular property and place needed, I am not now prepared to uphold it. I am even disposed to go further, and say, that if any property of any kind is not so situated as to be either in the direct path for a public highway, or be really needed to build it, the inclination of my mind is, that it cannot be taken against the consent of the owner. Because, though the right of eminent domain exists in some cases, it does not exist in all, nor as to all property, but probably as to such property only as, from its locality, and fitness, is necessary to the public use. *Semb.*, 4 Mylne & Craig, 116 ; Webb *v.* Manch. & Leeds Railway Co., 1 Railway Cases, 576.

It may be such, not only for the bed of the road, but perhaps for materials in gravel, stone, and timber, to build it with. Yet even then it must be necessary and appropriate as incidents. 2 Dev. & Bat. 462 ; 13 East, 200.

And also, for aught I now see, circumstances must, from its locality and the public wants, raise an urgent necessity for it. " The public necessities " are spoken of usually as the fit occasion to exercise the power, if it be not derived from them in a great degree, and the reason of the case is confined to them. (See cases before.)

The ancient *trinoda necessitas* extended to nothing beyond such necessity.

Indeed, without further examination, I fear that even these limitations may not be found sufficient in some kinds of public highways, — such as railroads, for instance. And I must hear more in support of this last position before acquiescing in their right to take, *in invitum*, all the materials necessary to build such roads, — as the timbers on which their rails are laid, or the iron for the rails themselves.

Nor do I agree that, in all cases of a public use, property which is suitable or appropriate can be condemned. The public use here is for a road, and the reasoning and cases are confined chiefly to bridges and roads, and the incidents to war. But the doctrine, that this right of eminent domain exists for every kind of public use, or for such a use when merely convenient, though not necessary, does not seem to me by any means clearly maintainable. It is too broad, too open to abuse. Where the public use is one general and pressing, like that often in war for sites of batteries, or for provisions, little doubt would exist as to the right. *Salus populi suprema est lex.* So as to a road, if really demanded in particular forms and places to accommodate a growing and changing community, and to keep up with the wants and improvements of the age, — such as its pressing demands for easier social intercourse,

46*

quicker political communication, or better internal trade, — and. advancing with the public necessities from blazed trees to bridle-paths, and thence to wheel-roads, turnpikes, and rail-roads.

But when we go· to other public uses, not so urgent, not connected with precise localities, not difficult to be provided for without this power of eminent domain, and in places where it would be only convenient, but not necessary, I entertain strong doubts of its applicability. Who ever heard of laws *to* condemn private property for public use, for a marine hospital or state prison ?

So a·custom-house is a public use for the general government, and a court-house or jail for a State. But it would be difficult to find precedent or argument to justify taking private property, without consent, to erect them on, though appropriate. for the purpose. No necessity seems to exist, which is sufficient to justify so strong a measure. A particular locality as to a few rods in respect to their site is usually of no consequence.; while as to·a light-house, or fort, or wharf, or highway between certain termini, it may be very important and imperative. I am aware of no precedents, also, for·such seizures of private property abroad, for objects like the former, though some such doctrines appear to have been advanced in this country. 3 Paige, 45. Again, many things belonging to .bridges,·turnpikes, and railroads, where public corporations for some purposes, are not, like the land on which they rest, local and peculiar and public, in .the necessity to obtain them by the power of the eminent domain. Such seem to be cars, engines, &c., if not the timber for rails, and the rails themselves. Gordon *v.* C. & J. Railway Co., 2 Railway Cases, 809.

Such things do not seem to·come·within the public exigency connected with the roads which justifies the application of the principle of the eminent domain. Nor does even the path for the road, the easement itself, if the use of it be not public, but merely for particular individuals, and merely in some degree beneficial to the public. On the contrary, the user must be·for the people at large, — for travellers, — for all, — must also be compulsory·by them, and not optional with the.owners, — must be a right by the people, not a favor, — must be under public regulations as to tolls, or owned, or subject to be owned, by the State, in order to make the corporation and object public,' for a purpose like this. 3 Kent, Comm. 270 ; Railroad Co. *v.* Chappell, 1 Rice, 383 ; Memphis *v.* Overton, 3 Yerger, 53 ; King *v.* Russell, 6 Barn. & Cres. 566 ; King *v.* Ward, 4 Adol. & Ellis, 384.

It is not enough that there is an act of incorporation for a bridge, or turnpike, or railroad, to make them public, so as to be able to take private property constitutionally, without the owner's consent; but their uses, and object, or interests, must be what has just been indicated, — must in their essence, and character, and liabilities, be public within the meaning of the term "public use." There may be a private bridge, as well as private road, or private railroad, and this with or without an act of incorporation.

In the present instance, however, the use was to be for the whole community, and not a corporation of any kind. The property was taken to make a free road for the people of the State to use, and was thus eminently for a public use, and where there had before been tolls imposed for private profit and by a private corporation so far as regards the interest in its tolls and property.

And the only ground on which that corporation, private in interest, was entitled in any view originally to condemn land or collect tolls was, that the use of its bridge was public, — was open to all and at rates of fare fixed by the legislature and not by itself, and subjected to the revision and reduction of the public authorities.

It may be, and truly is, that individuals and the public are often extensively benefited by private roads, as they are by mills, and manufactories, and private bridges. But such a benefit is not technically nor substantially a public use, unless the public has rights. 1 Rice, 388. And in point of law it seems very questionable as to the power to call such a corporation a public one, and arm it with authority to seize on private property without the consent of its owners.

I exclude, therefore, all conclusions as to my opinions here being otherwise than in conformity to these suggestions; though when, as in the present case, a free public use in a highway and bridge is substituted for a toll-bridge, and on a long or great and increasing line of public travel, and thus vests both a new benefit and use, and a more enlarged one, in the public, and not in any few stockholders, I have no doubt that these entitle that public for such a use to condemn private property, whether owned by an individual or a corporation. Boston W. P. Co. *v.* B. & W. Railroad Corp., 23 Pick. 360. And it is manifest that unless such a course can be pursued, the means of social and commercial intercourse might be petrified, and remain for ages, like the fossil remains in sandstone, unaltered, and the government, the organ of a progressive community, be paralyzed in every important public improvement. 2 Dev. & Bat. 456; 1 Rice, 395; 8 Dana, 309.

I exclude, also, any inference, that, in assenting to the doctrine, that an act of incorporation for a toll-bridge is a contract, giving private interests and rights as well as public ones, and thereby not allowing a State to take the private ones or alter them, unless for some legitimate public use, or by consent, as laid down in 4 Wheat. 628, I can or do assent to the doctrine of some of the judges there in respect to public *offices* being such contracts as not to be changed or abolished by a State on public considerations, without incurring a violation of the contract.

I should be very reluctant to hold, till further advised, that public offices are not, like public towns, counties, &c., mere political establishments, to be abolished or changed for political considerations connected with the public welfare. 9 Cranch, 43. The salaries, duration, and existence of the offices themselves seem to be exclusively public matters, open to any modification which the representatives of the public may decide to be necessary, whenever no express restriction on the subject has been imposed in the constitution or laws. *Quære.* Hoke *v.* Henderson, 4 Dev. 1.

This would seem the implied condition of the office or contract, as much as that it may be taxed by the government under which it is held, though not by other governments so as to impair or obstruct it. See, as to the last, McCulloch *v.* Maryland, 4 Wheat. 316; Weston *v.* The C. C. of Charleston, 2 Peters, 449; Dobbins *v.* Comm. of Erie City, 16 Peters, 435.

Finally, I do not agree that even this franchise, as property, can be taken from this corporation without violating the contract with it, unless the measure was honest, *bonâ fide,* and really required for what it professed to be, beside being, as before remarked, proper, on account of the locality and nature of this property, to be condemned for this purpose.

And though I agree, that, for most cases and purposes, the public authorities in a State are the suitable judges as to this point, and that the judiciary only decide if their laws are constitutional (2 Kent, Comm. 340; 1 Rice, 383); that the legislature generally acts for the public in this (2 Porter, 303; 3 Bl. Comm. 139, note; 4 D. & E. 794, 797); that road agents are their agents, under this limitation (1 Rice, 383); yet I am not prepared to agree, that if, on the face of the whole proceedings, — the law, the report of commissioners, and the doings of the courts, — it is manifest that the object was not legitimate, or that illegal intentions were covered up in forms, or the whole proceedings a mere "pretext," our duty would require us to uphold them. Ibid.; Rice, 391. In England, though

this power exists, yet if used maliciously or wantonly, it is held to be void. Boyfield *v.* Porter et al., 13 East, 200.

In this case, however, while the fairness of it is impeached by the plaintiffs in error, yet on the record the object avowed is legal. It was to make travel free where it was before taxed, and the bridge, though remote from the changes desired in the old road, was still situated on the great line of travel over it, and not merely by color and finesse connected, and, from increases in population and business, seemed proper to be made free at the expense of the town or county.

Nor on the face of the record do the proceedings seem void, because the assessment may have been without a jury, when it was made by the legal officers, appointed for that purpose. 3 Peters, 280; 2 Dev. & Bat. 451, 460; Beekman *v.* Sar. Railroad, 3 Paige, Ch. 45. Nor void as made by the commissioners without notice, when the return states notice, and when there was a full hearing enjoyed by all before the court on the report.

Nor void because the compensation was too small to the corporation, — as it was assessed in conformity to law, — or too burdensome to the town alone to discharge, though the last might well have been flung on a larger number, like a county. 10 N. Hamp. 370; Tomlins, Dict., *Ways*, 2; 1 Rice, 392. Nor because the commissioners take a fee instead of an easement, when the legislature provide for a fee as more expedient. 2 Dev. & Bat. 451, 467. Nor because some of the property condemned was personal, when it was mixed with the real, and when real or personal, if needed and appropriate, may at times be liable. 1 Rice, 383.

With these explanations, I would express my concurrence in the judgment of the court.

Mr. Justice WAYNE delivered a dissenting opinion.

### Order.

The West River Bridge Company, Plaintiffs in error, *v.* Joseph Dix, and the Towns of Brattleboro' and Dummerston in the County of Windham.

This cause came on to be heard on the transcript of the record from the Supreme Court of Judicature of the State of Vermont, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be and the same is hereby affirmed, with costs.

The West River Bridge Company, Plaintiffs in error, v. The Towns of Brattleboro' and Dummerston, in the County of Windham, and Joseph Dix, Asa Boyden, and Phineas Underwood.

This cause came on to be heard on the transcript of the record from the Supreme Court of Judicature of the State of Vermont, and the Chancellor of the first Judicial Circuit of the said State of Vermont, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court of Judicature and Chancellor of the first Judicial Circuit of the State of Vermont in this cause be and the same is hereby affirmed, with costs.