Charles M. Allmond, the defendant, was indicted for selling intoxicating liquor contrary to the provisions of the act of the Legislature entitled "An Act for the suppression of Intemperance," passed on the 27th day of February, 1855, prohibiting the sale of intoxicating liquor for any other than mechanical, chemical and medicinal purposes, and pure wine for sacramental use, and restricting the right to sell even for such purposes, to not more than three persons in each hundred in the State and five in the city of Wilmington, to be licensed as provided for in the act, with the exception, however, of importers of foreign intoxicating liquors under the authority of the laws of the United States, so long as they remained in the original cask or package in which they were imported.
The counsel for the defendant before the case was called for trial, submitted a formal motion to the court to quash the indictment on the ground that the act of the Legislature under which the defendant had been indicted, was unconstitutional and void.
By the first article of the constitution of the State no power was delegated to either department of the government, but the sole object of it seemed to have been at the very outset and formation of it, to reserve and retain in express terms certain inherent and fundamental rights which pertain to all men independently of any and all forms of government, out of the powers to be delegated and conferred by it; and prominent among these was first the declaration contained in the very commencement of it, that "through divine goodness all men have by nature", among other inherent and essential rights, the right of "enjoying and defending life and liberty, of acquiring and protecting reputation and property, and in *Page 615 
general, of attaining objects suitable to their condition, without injury by one to another;" and the next which should be noticed in this connection was the provision contained in the seventh section of the first article, to the effect that no one accused of any criminal offense, "shall be deprived of life, liberty or property, unless by the judgment of his peers, or the law of the land."
But by the arbitrary and extraordinary act in question, the Legislature had utterly and absolutely prohibited and forbidden within the limits of this State the sale of, and the right to acquire by purchase, a large class of commercial commodities including all spirituous, vinous and fermented liquors, in themselves innoxious and of great intrinsic value in their general uses, and hitherto universally and uniformly recognized and considered in the commercial code of all civilized nations and in this State likewise, until the date of this enactment, as lawful property, which any and every man might lawfully acquire and use, except for certain specific purposes stated in the act, which could have no other effect than to abolish the use and consumption of them almost entirely among us, and thus to abrogate, annul and destroy the value of all such property, as well as the inherent right of any one to acquire or use it for any other purpose than those indicated in the act; and by so doing, had assumed to adjudge and proclaim not only that it was not suitable to the condition of any man, however temperate, moderate or judicious might be his use of it, for any other than mechanical, medicinal, chemical or sacramental uses; and for any other purposes whatever, such commodities were no longer property, and that it shall be a crime to buy and sell them except as before stated. Was it competent for the Legislature to pass such an act? Was it: either just, or reasonable, expedient, or necessary, or did it accord with any just conceptions of a free people as to the inherent attributes of legislative power in a body chosen by themselves and clothed by them directly with all the power and sovereignty which for the time being *Page 616 
it possessed, to pass any such extraordinary, arbitrary and despotic act as this? An act of indiscriminate, absolute and total prohibition against the sale of an article of general and almost universal use and consumption to a greater, or less degree, for the only purposes and in the only mode, which imparts any value to it as property and as an article of ordinary and hitherto lawful merchandise, trade and commerce, not only in this State, but throughout the world. So trifling and insignificant was the demand for it for the few and special purposes excepted in the act, and as the act was immediate and took effect from its date, it might be said without exaggeration, to abolish instantaneously by a stroke of the pen within the entire limits of this State, both the buying and the selling of it, both the demand for and the supply of it, and thereby utterly annihilated the value of it, by entirely destroying the exchangeable quality of it as a commercial commodity, and an article of property in contemplation of law, and which in a word, was unquestionably the same thing substantially as the destruction of the property itself.
But the title of the act disclosed the object of it, "the suppression of intemperance," and doubtless on that ground, both the policy and validity of it would be advocated on the other side. That is to say, that the legislature had the power to enact it for the public benefit and the general good of the State. But the constitution, out of the profound regard, which the free and enlightened framers of it entertained for the inherent and fundamental rights of all men to acquire and protect property suitable to their condition, and of which, of course, the possessor must be the sole judge, since no man could be deprived of anything he owned, by another without his consent, which both the law and the constitution utterly forbids, expressly provides that private property shall not be taken even for the public use, which of course implies for the public good, or benefit, without compensation being made for it. But wherein consisted the essential *Page 617 
difference between taking a man's property from him, and absolutely destroying it, or by an arbitrary act of legislation, rendering it utterly valueless or worthless to him? Take for instance, a stock of goods which to-day is lawful merchandise under the tax paid and the license obtained for the sale of it, where is the difference either in point of fact, or within the spirit and meaning of this prohibition in the constitution upon the legislative power of the State, to the merchant, the owner and possessor of it, whether by an act of confiscation, or of condemnation for the public use and benefit, the State instantly seizes them, or it passes an act totally prohibiting the sale of them, or only for such limited and specific purposes as would be equivalent almost to entirely abrogating the market for them? Take away the general right to sell property, and you might as well take the property itself, for without the right of sale, it is without value, because what it will sell for in the market is in general the measure and standard of its value, and if it has no value there, the law itself would cease to recognize it as property and no damages could be recovered in any action for the wrongful appropriation, injury, or destruction of it, even by an individual, beyond merely nominal damages.
But admitting the vice of intemperance to be as great a public evil as the authors of this act evidently conceived it to be, could the suppression of it, even if such legislation could accomplish such a result, but which it could not do, in reason and justice warrant any Legislature in doing what the late Legislature had done for this purpose? Has it any right, moral, social, or political, (because after all, but a small number comparatively of every community in this country indulge in the use and consumption of intoxicating liquors to excess and but a still smaller number deal and trade in them to the public injury and detriment) to utterly prohibit the multitude of its better and more respectable citizens, whose taste, and condition, and good judgment alike warrant them in *Page 618 
the moderate and temperate use and consumption of it and who have hitherto enjoyed the uninterrupted legal, as well as moral right to use it, and have used it without the slightest injury or detriment to themselves, to the public, or to any body else, from either buying, or selling it, and to proclaim to all alike indiscriminately that they shall not acquire or use a particle of it, except for the purposes therein stated, unless they go beyond the limits of the. State to obtain it? Could such a rigid prohibition and exclusion of any species of property which had heretofore been of such general use in the State and in all parts of the country, be justified or vindicated, except upon the hypothesis and the theory that the Legislature, like the Parliament of Great Britain, is omnipotent and is practically indued with absolute and unlimited legislative power over the freemen of this State?
But the object of the act, which was the suppression of intemperance, although commendable in the abstract, could not justify such an infraction of the rights of the people generally for the benefit of comparatively a few individually, and because the tendency of the traffic was to increase the evil and was pernicious to the public in the estimation of those who enacted it. The clause, however, first quoted from the constitution, whilst it proclaims the fundamental and universal right of man of acquiring and protecting property and attaining objects suitable to his condition, "without injury by one to another," contains no such remote or prospective qualification, or condition, or limitation as this act contemplated; for those terms imported without fraud, force, or violence, or wrong by one person to another, as individuals, and not as between a citizen of the State and the State, or the public generally, and had no relation to public wrongs, or the tendency of any particular thing to the prejudice of the community. But the accusation and indictment in this case was not for any wrong done, or injury perpetrated by one person to another, but for a wrong done to the whole State in a moral, domestic and *Page 619 
social aspect merely; and although the case was nominally between the State and the defendant, the real issue involved and presented in it, was between the people and the Legislature. It was not the tendency of principles, or of practice either, to the prejudice of society, that can be prohibited by legislation or punished by civil magistrates, without endangering civil liberty; for it is only when those principles lead to overt acts, that the legislative authority can interfere to punish such acts. State v. Chandler, 2 Harr. 576. The restrictions contained in the other clause of the constitution which had been referred to, that no one accused of any criminal offense shall "be deprived of life, liberty or property, unless by the judgment of his peers, or the law of the land," were derived from Magna Charta,
but in that celebrated charter of English liberty, they were restrictions dictated and imposed by oppressed subjects on the power of the Crown, the sovereign power at that day, at least, in Great Britain; but here they were designed to be restrictions on the power of the Legislature and should receive the same liberal and enlightened construction which they have ever received there in favor of the rights and liberties of the people against unjust, unreasonable, excessive and oppressive legislation. Coke's Inst. chap. 29. And the words as employed in Magna Charta, meant trial by jury on indictment found, whilst here they import by due process of law, which signified the same thing. Green v. Briggs et al. Curt. Rep. 321. Civil government was ordained for the protection of civil rights and not for the propogation, or enforcement of moral precepts or social ethics, and where it was least required that it should resort to such efforts, that is to say, under a liberal, enlightened and republican form of government like ours, it was only the more dangerous to the rights and liberties of the people to attempt it.
Had the Legislature the power under the constitution to prescribe the regimen and diet of every man in the State, or had it the power to enact what are usually denominated *Page 620 
sumptuary laws? It had always been considered that such acts were unconstitutional in this country, and of this opinion was James Madison.Mad. Papers 447. But if it had not such a power, whence did it derive the authority to enact, not only that no citizen of this State, however temperate or discreet in the use of such an article he may be, shall have a right to drink a drop of intoxicating liquor, except as a medicine, but also shall have no right whatever to acquire it within the limits of this State, except for such a purpose? Concede such an extraordinary and unlimited attribute of sovereignty as that to the Legislature, and to what tyranny and oppression, odious and intolerable to the last degree, might it not lead! They would admit the right of the Legislature by virtue of its police power and its discretion to tax, and thus to regulate the trade and commerce within the State in these, as well as other articles of general use and consumption. But the design of this act was the total and absolute prohibition of this particular species of property for such purposes, and this power they unequivocally disputed and denied, for the power to regulate was a very different thing and did not involve the right to absolutely prohibit trade. In a recent case, Wynchamer's Case, lately tried in New York, it was so ruled on the ground that inasmuch as an act of the Legislature of that State absolutely prohibited the sale of spirituous liquors, by so doing, it destroyed the value of such liquor and was equivalent to the destruction of the property itself and was therefore unconstitutional. Would any one pretend that the Legislature had the power to prohibit the sale, or the general use and consumption of anything which it might consider dangerous or deleterious in its tendency when injudiciously, or indiscreetly used, to the welfare, or safety of the people of the State? It would be conceded that to prevent the injury resulting from the abuse of it, the Legislature may regulate and restrain the traffic, and legislate in that way directly against the abuse and the evil itself which *Page 621 
it seeks to remedy and repress. But did the power to do this, enable it to go to the extent that no one should have it, no one should buy it, no one should sell it and no one should use it, however discreet or judicious may be his enjoyment of it, except for a few trivial purposes, which only serve to render the prohibition all but complete? Take for example the article of gunpowder, far more dangerous and fatal in its effects and results to human life when injudiciously and indiscreetly used. The Legislature undoubtedly has full power to regulate the trade in this species of property, so far, at least, as to prescribe where it shall be stored, when the public safety requires it to be done; but would it have the power to prohibit the sale of gunpowder altogether, or to proclaim by a penal enactment like this, that no man in this State should have it, or use it, except for a purpose so special and restricted that one in ten thousand would never have need of it at all?
But the act in question was also in contravention of the constitution of the United States. The prohibition was against the sale of all intoxicating liquors, except for the purposes already stated, and excepting likewise imported liquors, but by the terms of it, the latter exception applied only to imported liquors while in the hands of the importer, and rendered the sale of them unlawful even in the original cask or package in which they were imported, in any other hands than those of the importer; and this latter provision and restriction of the act, presented and involved a question on this subject which had never directly arisen in, or been directly decided by, the Supreme Court of the United States. Although the reasoning of some of the Judges in the case of Brown v. The State of Maryland, 12 Wheat. 419, 7Curt. Cond. Rep. 262, might go to this extent, the question itself was coram non judice, for the facts did not present it, and the only question directly presented and decided in that case was, that whilst it continued in the hands of the importer, the article was exempt from State taxation, *Page 622 
and the reasoning of the court in announcing the decision went to the extent of exempting it from State taxation as long as it remained in the state of an import even in the hands of a subsequent purchaser. And yet the power to tax was universally conceded to be as supreme and unlimited as the police power, or any other power conferred upon the Legislature of a State. Neither did the License Cases, as they were termed, 5 How. 504, 16 Curt. Cond. Rep. 513, decide that a State could prohibit within its limits the sale of imported liquors so long as they continued in the state or condition of an import; on the contrary, they simply decide that when that condition was changed and it was broken up and became incorporated with the general property of the State, that they ceased to be an import and the sale of them might then be prohibited, or regulated by a State within its own limits.
It was very important that the court should examine the act in question with reference to reservations contained in the constitution. The design of the act was to promote the suppression of the vice of intemperance as a social and public evil. Was that an object within the scope of the legitimate power of the Legislature? It had already been shown by a reference to the legislation of the State from the earliest period, that it had always been regarded as an object deserving the attention *Page 624 
of government, and subject to the control of its rightful authority. An individual it was true, might do with his own as best suited his pleasure, so long as it concerned or affected no one but himself, and had nothing to do with others, or with society; but the State undoubtedly had authority to restrain the exercise of any individual right or liberty when it conflicted in a tangible and practical manner with the welfare of society. 1 Black. Com. 125. 2 Stob.Rep. 534; and that was a fundamental and elementary principle which laid as deep at the foundation of free and popular forms of government, as of any others.
The argument on the other side, however, rested mainly on the assumption that the act in question was what they were pleased to denominate and denounce as a prohibitory law. But such was not its true designation; for after all that had been said on that subject, it would be found on a full and dispassionate examination of its provisions, not prohibitory in the sense in which they had spoken of it, but only in restraint of the traffic before existing in intoxicating liquors within the limits of the State. And to show this, it was only necessary to ask and ascertain in what respect it affected or abridged the right of any one to sell such liquors in the State, who possessed any right or legal authority to sell the same at the time when this act went into effect and operation, which was immediately on the passage of it. Was there any right of sale, of which so much had been said on the other side, of intoxicating liquors in this State at that time, which was taken away, or destroyed by it? By the act of 1853, which was in full force when the present act was passed, no person could sell by retail any liquor which the present prohibited, without a license therefor duly obtained in the mode prescribed in that act, and excepting also tavern-keepers duly licensed as by law required; and the court would discover by turning to the twenty-seventh section, that the rights of all who were licensed to sell under that act, were expressly saved and *Page 625 
preserved to them by the present act for the full term for which such licenses had been granted. And so far from the latter being an immediate and total prohibition against the sale of such liquors except for the special purposes stated in it, the fact was that it left the general sale of them still unabridged and unimpaired to the same extent in which it found the legal right to sell generally then existing, restricted it was true, as it then was, but not annihilated or destroyed. The operation of the act was therefore, nothing more at the time of its enactment, than an additional prospective restriction on the sale of such liquors; a restrictive regulation, it was true, but nothing more than a restrictive regulation of the sale of them; and the power to regulate the sale of any commodity, involved and implied the right and authority to regulate with a view to restrict, as well as for any other purpose. 2 Hall's Law Journ. 260. Nor could the uses for which it authorized the sale of such liquors, be called colorable pretexts merely; for the power to regulate the trade in intoxicating liquors was an admitted legislative power, and the regulation of such traffic by legislation and license, might almost be called an institution of the State, for the constitution itself contained a special provision which expressly recognizes it and provides a judicial tribunal for the trial and punishment of all persons who violate the laws in this respect by selling without license, and even authorizes the Legislature to establish a special tribunal for the trial of that with other misdemeanors. Const. art. 6 sec. 15.
But it had been assumed in the argument on the other side, that the right to sell was an inherent right inseparable from property, and that the right to acquire such property as was prohibited to the extent which such liquors were prohibited in the act in question, was also a fundamental and inherent right guaranteed to every person in this State by the constitution. That is denied. The term property, as employed in the constitution and everywhere else, signified nothing more than the dominion *Page 626 
which a man had over anything, and which was better and usually expressed by the word ownership. A learned and eminent commentator on the laws of England, while he recognized the right of property as the third absolute right inherent in every Englishman, defined it to be the free use, enjoyment and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land, and whilst he also regards it as probably founded in nature, yet adds the modifications under which we at present find it, the method of conserving it in the owner, and of translating it from man to man, are entirely derived from society; and constitute some of those civil advantages, in exchange for which every individual has resigned a part of his natural liberty. 1 Black. Com. 138. But the disposal of property no more entered into the inviolability of property than the use of it. The Legislature could not take a man's house or lands from him without compensation, nor could it reduce his fee simple title in the same to a life estate; but did it thence follow that it could not prevent him from using it in a manner detrimental to others and the public? To show the fallacy of the idea that the right to sell or dispose of property is a right inherent in and inseparable from property in the sense employed in the constitution and was therefore beyond the regulation and control of the legislative power, they referred the court to 7 Cow. 604, 11 Metc. 57, 7Cush. 53, 85, 88, 102. They cited these cases to show what they clearly established, that while property was inviolable, the right of enjoyment and disposal of it at the will of the owner was not absolute or illimitable, but was subject to be regulated and controlled by the legislative power whenever the public good required it, of which that power was the sole judge. And if that was so, could it be possible, could it be true, that the right to sell intoxicating liquor was a right incident to and inseparable from that particular species of property which the Legislature had no constitutional power to regulate and control? If so, then all our laws on this *Page 627 
subject had been from the beginning unconstitutional and void.
But what was the true meaning and import of the words which had been so often repeated on the other side from the constitution, "nor shall any one be deprived of life, liberty or property unless by the judgment of his peers, or the law of the land?" The meaning of the word property had already been shown and the question next arises what is the meaning of the term deprived? And the meaning of that is taken. It had been said that this provision of the constitution had been derived frommagna charta, and it doubtless was drawn substantially from that source and means substantially the same as the language employed in that instrument; but the words employed in magna charta
are, "nor shall any one be disseized of his lands ordispossessed of his goods and chattels, unless by the judgment of his peers, or the law of the land," and as these were phrases of fixed legal, as well as general signification, no one could misunderstand the meaning or application, for they each imported an actual seizure, an actual taking of a wrongful kind without color, or authority of law. 2 Coke's Inst. chap. 29, p. 45.
The constitution in the broadest terms delegated the legislative power of the State to the two houses of the Legislature, and it was conceded that all its powers were derived from the people, and not denied that the judiciary were to judge of its limits; but their judgments were to be guided by the constitution and the limitations which it imposes, and could not go outside of it. The Courts could refuse to administer to enforce a law only because there was another and paramount law, the constitution, with which it conflicted, and which they, as well as the Legislature, were sworn to support and obey. They could not refuse to execute a law on any idea of a conflict with their own notions of politics, liberty, or innate rights not recognized by the constitution, nor could they test the validity of it by any criterion of usage and conformity, public policy, or republican principles, or anything *Page 628 
else than the constitution itself, which restrains alike the Judiciary and the Legislature, for if there were any such considerations applying in any case, they belonged to the legislative and not the judicial discretion, and were questions to be decided by the former and not by the latter. How far such a restraint as this act in question imposed on the trade in intoxicating liquors, was either expedient, necessary, or judicious, was certainly as well and even better, left where it was left by the constitution, solely with the Legislature. It must at best, after all, be left to human judgment, and where the power exists to restrain it, there also necessarily inhered and resided the authority and discretion to determine the degree and the means by which it was to be accomplished; and not a solitary case could be found in which any court had ever assumed to hold any legislative enactment inoperative and void, because in its judgment the means employed were not adapted to the end to be attained by it, or were even contrary to its notions of natural right and justice, unless founded on the constitution. The case of Rice v. Foster which had been cited on the other side was no exception, for in that case the Legislature attempted to delegate the power to make the law in question back to the people, and which the court held to be clearly contrary to the spirit and meaning of the constitution.
Should the court, however, consider the act unconstitutional so far as it prohibited the sale of such liquor as was owned at the time when it went into effect, it could not for that reason be held to be unconstitutional, inoperative, or void as to any liquor acquired subsequent to its passage, although it was designed to apply to such as was acquired and held before and at that time; because if the courts cannot give to such a law a present, they will, at least, give to them a prospective operation. 2 Mod. 310. 2 Atk. 36. 4Burr. 2460. 4 Serg. Rawle 401. 24 Pick.362. 3 Wash. C. C. Rep. 318. 1 Harr. 80.
As to the objection which had been taken that the act *Page 629 
was also in contravention of the constitution of the United States, because of the provision which it contained in regard to imported intoxicating liquors, it did not go beyond the rulings which had already been announced on the subject in the federal tribunals themselves. In the case of Brown v. The State of Maryland, 12 Wheat. 453, it was ruled that the importer by the payment of the duty to the United States, purchases the right to sell it and that so long as the import remained in the hands of the importer in the original bale, or package and unbroken up, it was exempt from. State taxation; and the same was the rule recognized and reaffirmed in the License Cases in 5 Howard: and neither of them go any further, and it was safe to say from the reasoning of the judges in those cases, that no change of circumstances or modification of facts as presented in them, could possibly have carried either the decision or the exemption beyond that point.
All governments whether limited or absolute, were essentially sovereign, and have certain rights and are subject to certain duties, and first among these was the right and the duty to protect its own citizens; and for this purpose, every government that deserved a name as such, possessed the two powers of eminent domain and municipal police with which it could not part, and which were unlimited and unrestrained, except so far as they were restricted by the express limitations and reservations contained in the constitution, if perchance, it has the good fortune to have any, and particularly a written one as well expressed and defined as Delaware. By virtue of the first, it can take private property for public use by paying for it as the constitution requires, and by the latter, the private use and enjoyment and the sale of it by the owner may be regulated, restrained, or prohibited for reasons of public policy and for the general good, without compensation; and these two powers were paramount to any and all the private rights of its citizens. 6 How. 507. And it was now becoming in the presence of this *Page 630 
enlightened court to add, what it so well knows, that both of these high powers reside exclusively in the legislative department of the government. And although the first was directly delegated in express terms in the constitution, yet the latter was not less clearly and conclusively contained and implied in the general grant and delegation by the people of the legislative power to it. Nor would they detain the court or waste their time by attempting either to enumerate or illustrate the various modes in which this latter power had been exercised from the foundation of the government in a greater or less degree on grounds of public policy and the public good by the Legislature, for the instances of such legislation on our statute books, both in regard to real and personal property, were so various, frequent and familiar that they would readily occur to the court without the necessity of a further reference to them.
As to the recent case in New York which had been referred to on the other side, they would only say that it was quite evident from the reasons on which they rested their decision in that case, that three out of the four Judges who held the act of that State to be unconstitutional, if now sitting in this court, would hold the present act of our State to be constitutional; for their reasoning clearly showed that whilst they considered the immediate and inevitable effect of their act was to destroy all such property then in the hands of any one in the State, inasmuch as the act made it alike a penal offence either to have it in possession, or to sell it, and consequently he would have no recourse left under the act but to destroy it, it at the same time as clearly showed that in the judgment and opinion of those Judges, our act on the contrary, was nothing more than a regulation of the trade in the article, and neither a taking or a destruction of such property.
Legislative power is an attribute of sovereignty. Whether *Page 631 
derived from a written constitution, or existing prior to it, and merely recognized for the purpose of being assigned to the proper department, it is the same. In this State, it exists in the people at large, or has been delegated by them to representatives with certain reservations and restrictions, expressly named in the constitution, or necessarily implied from it, or such as may arise from the Federal Union, as expressed or necessarily implied in the constitution of the United States.
The act under consideration has been assailed in the argument as opposed to both of these constitutions, and as violating the State constitution, both in its express restrictions and implied reservations. What these implications are, have not been, and cannot be, very satisfactorily explained; but it was argued that legislative power may be so abused in its exercise as to exceed its own delegated limits, and invade, not merely the rights expressly reserved to the people, but certain innate, inalienable rights, existing in the citizen prior to the constitution; and depending neither upon its recognition, nor reservation, for judicial enforcement.
It is not easy to embrace a definite idea of this sublimated right, without referring it to the acknowledged power of changing the constitution itself at the will of those by whom, and for whose welfare, it was made. Apart from this idea it is difficult to conceive of any power to make or unmake law that has not been delegated to the people's representatives by the written constitution, with the restrictions therein contained, and the reservations made by what is usually called the Bill of Rights. If there be any legislative power beyond or above this, it would seem to belong to the people themselves, to be exercised in the usual forms of organic change, or by revolution.
The innate or natural rights are comprehensively referred to in our Bill of Rights, which is believed to embrace, to the full extent, this idea of a higher law, or the existence of rights paramount to the constitution itself. *Page 632 
"Through Divine Goodness (says the preamble to the constitution) all men have by nature the rights of worshipping and serving their Creator according to their consciences, of enjoying and defending life and liberty, of acquiring and protecting reputation and property, and in general of attaining objects suitable to their condition, without injury one to another, and as these rights are essential to their welfare, for the due exercise thereof, power is inherent in them."
But the great law of social self preservation is equally a paramount law essential to the enjoyment of the natural rights thus declared to belong to "all men". Freedom of conscience cannot be secured; life and liberty cannot be enjoyed and defended; nor property and reputation acquired and protected, unless society has the power to compel its members to respect these rights by imposing sanctions, which, in the due course of law, shall even take away from those who would prevent others from the enjoyment of them, the rights thus declared to be natural rights, and which in fact constitute the existence of the social system.
For this purpose, government is instituted among men having its sanctions both in the consent of the governed, and in the necessity of putting even innate rights under such control as is essential to their preservation. Hence the power to take life or restrain liberty; to regulate the use or forfeit the enjoyment of property in the due course of law; a power existing in the very structure and carried out in the practice of every community; particularly in those which give the best protection to these rights which are assumed to belong to all men.
If the higher rights to life, liberty and the enjoyment of property be thus subject to the sovereign power of the State, the power to regulate the use of property to secure the enjoyment of these rights, and promote the objects for which government is formed cannot be doubted. The Legislature may by general laws regulate and restrict the use of property which it deems dangerous *Page 633 
to the existence, peace or welfare of society, and may prevent the acquisition of such kinds of property as it considers so dangerous as to require such prohibition. The Legislature of this State has done so from the beginning, by prescribing the modes of acquiring and using, the transfer and disposition of property of all kinds; and the restriction or prohibition not merely of certain kinds of property, but of trades, professions and callings; thus regulating not only property itself but the personal industry and enterprise through which property is acquired. I refer to the statutes, among the first enacted, for the conveyance of property; the statutes of wills; the intestate laws; all license laws; laws, regulating physicians, surgeons, attornies, millers, ferries and fisheries; laws regulating the weight and price of breadstuff, and laws regulating inn-keepers and venders of liquor generally, which comes more directly to the matter under investigation.
As early as 1739, the act of 13, Geo. 2, prohibited the sale of spirituous liquor by measure less than a quart; of wine less than half a gallon; other liquor by measure less than a gallon; and punch or mixed liquors by any quantity whatever; and authorized certain officers to regulate the price of liquor lawfully sold under these restrictions. This legislation was followed by the act of June 24, 1786, "for the suppression of idleness, vice and immorality," which, with other acts of the same kind, was in terms saved by the constitutions of 1792 and 1832. From that day to this the sale of liquor in this State has been under the restraint of laws more or less stringent, according to the will of the legislature; and the question now is, whether the last act "for the suppression of intemperance," — that of 1855, — differs in principle from the others; or whether the whole system of restrictive legislation has been unconstitutional from the beginning.
With the policy or wisdom of the act under consideration we have no concern. We did not make, and cannot repeal, this or any other law. Our official duty is *Page 634 
merely to decide whether the act in question is a law, passed by competent authority, within the scope of legislative power. That duty will be performed without reference to any other considerations than such as apply to an abstract question of constitutional law, and the power of this tribunal, derived from the constitution itself, to decide upon the validity of the act in question, as an expression of legislative will.
It is the province of the Judiciary to decide what is law; to pronounce invalid legislative acts unconstitutionally passed; and to annul such as may violate constitutional restrictions; but it may well be doubted whether a case can arise requiring of the Judiciary the exercise of an assumed power to annul any act of legislation which the constitution itself does not condemn. Without a veto power existing in any other department, the constitution of this State vests the whole legislative power in a Senate and House of Representatives who represent all the people in the exercise of this highest attribute of sovereignty. And when these representatives are supposed in any act of legislation unwisely, or improperly, to restrain what are assumed to be the rights of the people, it is for the people themselves to correct the evil through legislative repeal, and not by Judicial-usurpation.
The question, therefore, is whether the act of 1855 violates the constitution of this State, or of the United States. The argument in respect to the latter has been that the restraints which it imposes on the traffic in foreign liquor affects the power of Congress to regulate commerce, and lessens the revenue derived from the importation of liquor as an article of merchandise. This question belongs appropriately to the federal courts, in which it has been repeatedly considered, with results which have even been the subject of dispute in the argument of this case. That doubt would be enough to settle this branch of the case; for no State Court would declare an act of its own legislation unconstitutional on a *Page 635 
question of conflict with a power of Congress so doubtful in itself that the federal Judiciary, after repeated trials, have not been able to define it. But we do not so understand their decisions.
The right of the government to import, and the right of the State to tax, regulate or restrict the sale of foreign goods, are both recognized by these decisions — 4 Wheat. Rep. 316,McCullough v. the State of Maryland. 12 Wheat. Rep. 453,Brown v. Maryland, and the License Cases in 5Howard's Rep. 574. The right of the one arises from the power to regulate commerce; that of the other exists as a police power, essential to the independence and sovereignty of the State. The Judges differ about the precise line where imports cease to be protected from State legislation as imports, and become, like all other property, subject to it; but the dispute is not whether the States have a right to tax or restrict imported goods after they are broken up, or sold by the importers, but whether these laws shall reach them in the importer's hands. The opinions of Judges Daniel and Thompson go even to that extent, while the judgment of the Court only claims for imported goods immunity from State legislation while unbroken in the importer's hands; and that is precisely the exception contained in the 18th section of our law.
In what are usually called "the License Cases," the Supreme Court decided the following principles: —
That laws of Massachusetts providing that no person should sell spirituous liquor in less quantity than twenty-eight gallons, without a license to be granted by certain officers, and that such licenses should not be granted when, in the opinion of these officers, the public good did not require them to be granted;
That laws of Rhode Island forbidding the sale of such liquor in a less quantity than ten gallons, though the liquor sold was foreign liquor duly imported, and was bought of the importer; and,
That laws of New Hampshire imposing similar restrictions upon domestic liquor sent from one State to *Page 636 
another, and sold in the original cask, were none of them liable to objection as infringing the constitution or laws of the United States.
These decisions meet any objection that can be made against the act of our Legislature on these grounds. The cases were well considered; and, though the points ruled were necessarily confined to the question of conflict with the authority of Congress, the validity of such laws was fully recognized by all the Judges of that Court as within the scope of legislative power within the States.
Chief Justice Taney said: — "Although a State is bound to receive and permit the sale by the importer of any article of merchandise which Congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary, or advisable, to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the general government. And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice or debauchery, I see nothing in the constitution of the United States, to prevent it from regulating and restraining the traffic, or from prohibiting it altogether if it thinks proper."
Mr. Justice Daniel said: — "Every State that is in any sense sovereign, and independent, possesses, and must possess, the inherent power of controlling property held and owned within its jurisdiction, and in virtue and under the protection of its own laws; whether that control be exerted in taxing it, or in determining its tenure, or in directing the manner of its transmission; and this too, irrespective of the quantities in which it is held or transferred, or the sources whence it may have been derived."
Mr. Justice Woodbury said: — "From the first settlement of this country, and in the most other nations, ancient or modern, civilized or savage, it has been found useful to discountenance excesses in the use of intoxicating liquor." *Page 637 
 Mr. Justice Grier said: — "The true question presented by these cases, and one which I am not disposed to evade, is, whether the States have a right to prohibit the sale and consumption of an article of commerce which they believe to be pernicious in its effects, and the cause of disease, pauperism and crime. It is not necessary for the sake of justifying the State legislation now under consideration to array the appalling statistics of misery, pauperism and crime which have their origin in the use or abuse of ardent spirits. The police power which is exclusively in the States, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority."
Mr. Justice McLean said: — "The acknowledged police power of a State extends often to the destruction of property." "The State may regulate the sale of foreign spirits and such regulation is valid though it reduce the quantity of spirits consumed." A license may be required to sell foreign articles when those of domestic manufacture are sold without one; and if the foreign article be injurious to the health or morals of the community, a State may, in the exercise of that great and conservative police power which lies at the foundation of its prosperity, prohibit the sale of it."
It is true that these views of the Judges of the Supreme Court have not the force of judgments binding on this Court, and the same may be said of the State decisions directly on the question of legislative power. But they are the opinions of eminent constitutional lawyers; and we might add the names of many other Judges, as well as of common law writers in support of the same principles. We have seen no adjudged case which denies the power of a State in the exercise of its sovereignty to regulate the traffic in liquor for restraint,
as well as for revenue: and, as a police measure, to restrict, or prohibit the sale of liquor as injurious to public morals, or dangerous to public peace. The subjection of private property *Page 638 
in the mode of its enjoyment to the public good, and its subordination to general rights liable to be injured by its unrestricted use, is a principle lying at the foundations of government. It is a condition of the social state; the price of its enjoyment; entering into the very structure of organized society; existing by necessity for its preservation, and recognized by the constitution in the terms of its reservation, as "the right of acquiring and protecting reputation and property, and of attaining objects suitable to their condition, without injury one to another."
We come then to consider whether the act of 1855, "for the suppression of intemperance," violates any of the provisions of the constitution of this State; or is in any other way an unconstitutional exercise of legislative power. We have already considered this question with reference to what are supposed to be the innate, inalienable rights of citizens, and the powers of the Judiciary to impose limits to legislative discretion, other than those imposed by the constitution itself; and we have failed to discern the existence of such a power, with reference, at least, to the act of legislation which we are now reviewing. We will not say that it cannot be maintained with reference to any supposable case, so plainly tyrannical and unjust as to challenge universal condemnation; and yet it would be difficult to conceive a case of such legislation which would not violate some provision of the constitution itself. It is unsafe to rest the existence of such a power upon the basis of so violent a presumption. It were better to presume that no such legislation could emanate from representatives of the people, to whom is committed legislative power, than to predicate on its abuse the right of another department, which has no legislative power, to review legislative acts upon any other ground than their conformity with constitutional restrictions.
A few instances of such supposed extreme legislation have been mentioned in the argument; yet no decision *Page 639 
of this or of any other Court has been cited which is founded on such a power. The language of Judge Chase in Colder v. Bull, 3Dallas Rep. 386, and of the late Chief Justice of this Court in Rice v. Foster, 4 Harr. Rep. 479, may imply the claim of such a power in extreme cases, but neither the case then under consideration, nor the instances specified, required any such basis to support the opinion. They are all instances falling within the constitutional prohibition. A law that should make a man a Judge in his own cause would violate the provision of section 8, for an impartial trial, and take away the remedy which it secures in all cases by due course of law; and an act which would subvert our republican form of government, would violate the entire constitution of the State, and come in conflict with a provision of the constitution of the United States, which guarantees this form of government to each of the States, The judgment in Rice v. Foster imposed no limit on legislative power as existing in the General Assembly. It only denied the right to delegate that power to be exercised by a direct vote of the people themselves; a principle which has since been recognized, we believe, wherever it has been judicially considered.
Without denying the Judicial power, therefore, in any supposable extreme case to annul a legislative act upon higher grounds than those of express constitutional restriction, we do not affirm it. Our case does not require it, and we are not ambitious of the distinction for this court of furnishing the first adjudged case founded on such a principle. The New York cases certainly do not furnish a precedent.
On the question whether the grant of legislative power was restricted not only by the express provisions of the written constitution, but might be further restrained by judicial construction as against fundamental principles of liberty, common reason and natural rights, all the Judges in terms repudiated the doctrine, except Judge Comstock; and he recoiled from it, as Chief Justice *Page 640 
Marshall did in Fletcher v. Peck, 6 Cranch, 135, and avoided it by saying, what is equally true in the case before us, that "there is no process of reasoning by which it can be demonstrated that the `Act to prevent intemperance, pauperism and crime,' is void upon principles and theories outside of the constitution, which will not also, by an easier deduction, bring it in direct conflict with the constitution itself."
Judge Hubbard said, "I am opposed to the judiciary attempting to set bounds to legislative authority, or declaring a statute invalid upon any fanciful theory of higher law, or first principles of natural right, outside the constitution."
Judge Seldon. "To determine the extent of the law-making power, we have only to look to the provisions of the constitution. It has, and can have, no other limit than such as is there furnished, and the doctrine that there exists in the judiciary some vague, loose, and undefined power to annul a law, because in its judgment it is `contrary to natural equity and justice,' is in conflict with the first principles of government, and can never, I think, be maintained."
Judge Johnson is equally emphatic in denying the power, and argues against it at some length, with great force and conclusiveness.
On this subject the case of Sharpless and others v. The Mayor ofPhiladelphia, decided by the Supreme Court of Pennsylvania, presents, very fully the arguments on both sides of the question, but the judgment of the Court is against the power.
The act in question, therefore, is a police regulation plainly within the scope of legislative power, as conceded by all the cases cited, and by none more fully than the recent New York decisions upon the prohibitory liquor law of that State. And where the object is a legitimate one, any means which the Legislature may employ to attain it are lawful, if not inhibited by the constitution itself. The New York law, which authorizes the seizure *Page 641 
and destruction of, liquor in the hands of its owner, was held to impair the vested right of property thus lawfully possessed at the time of its passage, and we have no occasion to controvert the decision on that point, as our law contains no such provision. But we must dissent, and do dissent, from the position assumed by some of the Judges in those cases, and in the argument here, that the prohibition to sell an article of merchandise destroys its character as property, and takes away the vested rights of the owner. If this were true, the sovereignty of the State would be robbed of nearly all of its police power, and the individual right to dispose of his property would be above the right of the public to be protected in their morals, health, peace or safety. Posionous drugs; unwholesome food; infected goods; demoralizing books or prints; combustible and explosive substances; dangerous animals; and every species of property could be held and transferred at the will of the owner. The vendible quality of a thing is not of the substance of the thing in such sense that they may not be lawfully separated, and the right to have or own a thing does not oblige the State to furnish a market for its sale. The right to sell it is conferred by law and may be taken away by law, or its use prohibited in any specified form which is deemed to be injurious or demoralizing. 1 Black. Com. 138. Instances of this are so common in our legislation that I refer, in addition to such as have been mentioned, only to the prominent cases of the prohibition to sell slaves out of the State, and the prohibition of free negroes to own or have in possession fire arms or warlike instruments.
Restrictions on the sale of liquor fall under the same police power, and have always been imposed by law. A license has been required not for the purpose of revenue only, but for the purpose of restraint, and as Judge McLean remarked in the case before referred to, "The necessity of a license presupposes a prohibition of the right to sell, as to them who have no license." The purchase *Page 642 
of liquor under a license gives no power to sell without it; when the license expires the vendible character of the article, in that market, ceases in his hands, and the 27th section of this Act reserves the power of sale under all licenses before granted by virtue of any law of the State until such license expired.
As this consideration of the inviolability of the right of property is the point of difference between the Judges of New York in the liquor cases referred to, and relied on in the argument, I shall examine them more particularly, to show that their views even of this question would not be adverse to the validity of our law, on the principles assumed by them. If this be so, the defendant will be left without the authority of any adjudged case denying the power of the Legislature to pass laws similar in character to the Act under which he is indicted; unless it be the decision of a single Judge in Indiana expressed at chambers on the hearing of a habeas corpus case.
In the "Wynchamer case", Judge Comstock, while he regards the power of sale, we think erroneously, as "a fundamental right" of property essential to its character as property, places his judgment on the "physical destruction" of the liquor as a result of the law of New York. He says, "On the day the law took effect it was criminal to be in possession of intoxicating liquors, however innocently acquired the day before. It was criminal to sell them, and, under the law, therefore, no alternative was left to the owner but their immediate destruction."
Judge Hubbard admits that "there is no constitutional restriction on the power of the Legislature in the regulation of the sale or traffic in intoxicating drinks, whether affecting existing rights of property in liquor or not. As a scheme of regulation the degree of the limitation of the sale or traffic is a matter of legislative discretion. But he proceeds to say that the fault of the law he was considering was that it did not profess to be a scheme of regulation. "The plain design of the law seems to have *Page 643 
been to cut off the liquor itself; to insure its destruction by circumscribing the keeping of it, and authorizing its seizure if kept in a forbidden place, or with a criminal intent to sell. The entire right of sale within the State at least, is prohibited, and in this, in my judgment, consists the error of the law as it respects liquor owned when the law went into operation. If there had been any right of sale within the State preserved, for instance to a licensed vendor, although of minor importance, it would have been sufficient, perhaps, to have impressed the law with a character of regulation, and saved its validity."
Judge Seldon said, "while, therefore, I do not question the constitutionality of the general objects of the prohibitory law, and fully concede the power of the Legislature to prohibit the sale of intoxicating liquors, for all except mechanical, chemical and medicinal purposes, I cannot admit that it has the right to compel their immediate and unconditional destruction, as is, I think, substantially done by this law."
Judge A. S. Johnson. "I am not prepared to say that the Legislature may not, under the constitution, take away the right of sale to the extent which this act contemplates. But by a general prohibition of sale, irrespective of quantity and purpose, coupled with a prohibition even to keep it, except in a dwelling house where no store, c., is kept, and in places where certain arts and trades are carried on, the legal existence which the law and the constitution designate as property, is, in my judgment broken up, and the private injury is as completely effected as if the thing were physically taken away." "This scheme taken together, in my judgment is a scheme not of regulation, but of legal destruction of property, which, as much as any other, was under the protection of the Constitution."
Each of the Judges therefore, who decided against the constitutionality of the prohibitory liquor law of New York, based his opinion on grounds of objection not applicable to the act of our Legislature, and sustained the *Page 644 
principle of restrictive legislation to the full extent required to support its validity. The distinction upon which the majority went between the power to prohibit, and the power to regulate, was of course denied by the minority, and is not important in the decision of the case before us. We think it cannot be maintained. If the power exist, the extent to which it shall be exercised must be in the discretion of the Legislature, provided it be not merely colorable; and this was the view of the Supreme Court in the "License Cases." The point was there made in argument and was important. The law of Massachusetts gave the license commissioners power to refuse all licenses, and they practically exerted it. Mr. Webster contended that there was no difference, (as there is none) in substance between an absolute prohibition by the legislature, and a grant of power to another body to prohibit. The law was therefore prohibitory of retailing liquor under twenty-eight gallons. But none of the Judges recognized the distinction; some of them repudiated it. Judge Catron said, "I admit as inevitable that if the State has the power of restraint by licenses to any extent, she has the discretionary power to judge of its limit, and may go to the length of prohibiting sales altogether, if such be her policy."
If we were to hold, therefore, that the act of our Legislature which restrains, and we admit very closely restrains, the sale of intoxicating liquor was unconstitutional, we should go beyond any case heretofore adjudged, denying, on constitutional grounds, the power of the Legislature to regulate this kind of property for the protection of the health and morals of the community; a police power recognized in the theory, and asserted in the practice, of this and perhaps every other State. We should overrule case after case decided in other States on acts not to be distinguished from ours in principle, and disregard the opinions of the ablest Judges, including every Judge of the Supreme Court of the United States who has expressed an opinion on the question. We *Page 645 
should oppose the long continued and well settled practice of our own State, commencing with its earliest history, in a course of legislation on the same subject, differing only in degree and not in principle from the act in question; and we should in effect repeal a large number of laws, which, for other purposes, assert the right of government to regulate the use and enjoyment of private property for the public good. Whatever may be supposed to be the objections to this law founded on its expediency or policy, or its injurious operation upon the large amount of property invested in the trade which it restrains, this Court cannot assume the power to annul it on any such considerations.
The principles before stated sustain the general provisions of this law as within legislative power, and not prohibited by any express constitutional restrictions. The duty of the Court, therefore, is simply to pronounce it a law constitutionally enacted, and to leave all other questions with regard to it where such questions properly belong, with the people's representatives, and the people themselves. If it impose unnecessary restraints on the use or transfer of property; if it unwisely restrain any of their liberties, either in a restricted or more general sense; if its policy be doubtful, or its precedent dangerous, it is at most but an abuse of legislative power, to be remedied by the people, whose rights it is supposed to invade, in the constitutional mode of legislative repeal. If, on the contrary it contain the elements of reform for an admitted social evil, and is, what its authors designed it to be, and its friends insist it is, an Act for the Suppression of Intemperance, its wisdom and expediency will be ultimately vindicated by the people, as its constitutionality has been on the present trial, in the opinion of the Court.
The motion to quash the indictment is therefore denied.
 *Page 9